**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| JANE ROE, | Case No. **1:18-cv-312** |
| Plaintiff, | Judge **BLACK** |
| v. | MOTION FOR PRELIMINARY INJUNCTION |
| UNIVERSITY OF CINCINNATI, ET AL. | |
| Defendants | |

Pursuant to Federal R. Civil Rule 65, Plaintiff Jane Roe seeks, following a hearing, a preliminary injunction prohibiting Defendants, who are employees of The University of Cincinnati and, at all times, were implementing the policies and procedures of the school (collectively, unless indicated otherwise, "UC"), from suspending her in violation of her constitutional due process rights. This Motion is accompanied by the Affidavit of Jane Roe.

This case is one of many cases arising amidst a national controversy stemming from the Federal Department of Education, Office of Civil Rights' ("OCR") threats to withhold federal education funds to compel colleges and universities to address "sexual violence" on their campuses. While the Complaint raises a number of claims, this Motion focuses on a single unconstitutional aspect of the discipline process faced by Jane Roe: the imposition of discipline against Jane Roe and the failure of UC to initiate a disciplinary process against a similarly situated male student, John Doe, in violation of the Equal Protection guarantees of the Fourteenth Amendment. This claim is described in *Doe v. Miami Univ.*, 882 F.3d 579, 596 (6th Cir. 2018).

A preliminary injunction is necessary to preserve the *status quo* by allowing Jane Roe to finish school and maintain her ROTC scholarship pending the resolution of this matter.

## MEMORANDUM

## FACTS

Jane Roe brought this action for a declaratory judgment, violation of 42 U.S.C. §1983, violation of Title IX, and injunctive relief.  This case arises out of the decision of UC to impose disciplinary sanctions against Jane Roe in violation of her Constitutional due process rights.

Jane Roe is an undergraduate student at UC in the nursing program.  She also participates in the ROTC program.  UC suspended Jane Roe for an indefinite period of time  for allegedly engaging in sexual conduct with another student while that student was intoxicated and as a result, unable to provide consent.

### A.    UC's Response to The Growing Problem of Sexual Assaults on Campus

After years of criticism for being too lax on campus sexual assault, on April 11, 2011, OCR sent a  "Dear Colleague" to colleges and universities.  The Dear Colleague Letter indicated that, in order to comply with Title IX, colleges and Universities must have transparent, prompt procedures to investigate and resolve complaints of sexual misconduct.  Most notably, the Dear Colleague Letter required schools to adopt a relatively low burden of proof—"more likely than not"—in cases involving sexual misconduct, including assault. The Dear Colleague Letter has received substantial criticism.  One federal appeals court judge observed that the Dear Colleague Letter "was not adopted according to notice-and-comment rulemaking procedures; its extremely broad definition of 'sexual harassment' has no counterpart in federal civil rights case law; and the procedures prescribed for adjudication of sexual misconduct are heavily weighted in favor of finding guilt." *Plummer v. Univ. of Houston*, 860 F.3d 767, 779-80 (5th Cir. 2017) (Jones, J., dissenting).  On September 22, 2017, the Department of Education withdrew the Dear Colleague Letter and indicated its intent to issue new guidance "through a rulemaking process that responds to public comment." Letter from Office for

Civil Rights, U.S. Dep't of Educ. (September 22, 2017).[1]  In withdrawing the Dear Colleague Letter, OCR might have been describing OSU's actions in this case: prior actions "may have been well-intentioned, but . . . led to the deprivation of rights for many students—both accused students denied fair process and victims denied an adequate resolution of their complaints." *Id.* at 1-2.  OCR further said:

> Legal commentators have criticized the 2011 Letter . . . for placing "improper pressure upon universities to adopt procedures that do not afford fundamental fairness." As a result, many schools have established procedures for resolving allegations that "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation."

*Id.* at 1, *quoting Open Letter From Members Of The Penn Law School Faculty: Sexual Assault Complaints: Protecting Complainants And The Accused Students At Universities*, Feb. 8, 2015; *Rethink Harvard's Sexual Harassment Policy*, Boston Globe (Oct. 15, 2014) (statement of 28 members of the Harvard Law School faculty).

UC has been the subject of two investigations by OCR into the manner in which it investigates and adjudicates complaints of sexual assault and sexual harassment on campus.  OCR Docket No. 15-16-2178 (opened Feb. 17, 2017); OCR Docket No. 05-16-2039 (opened Feb. 9, 2016).  (*See* Complaint Exhibits A(1) and A(2).)  UC has also been the subject of extensive litigation alleging that the school has not acted appropriately in the investigation and adjudication of claims of sexual assault.  *See e.g. Helmicki v. University of Cincinnati et al.* S.D. Ohio No. 1:16-cv-00728; *Doe v. Cummins*, 662 F.App'x 437 (6th Cir.2016); *Doe v. Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017); *Gischel v. Univ. of Cincinnati*, S.D.Ohio No. 1:17-cv-475, 2018 U.S. Dist. LEXIS 18083 (Feb. 5, 2018).

UC has adopted a "Sexual Misconduct" Policy.  A copy of the Sexual Misconduct Policy is attached to the Complaint as Exhibit B. Students who violate the Sexual Misconduct Policy are

---

[1] Available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

subject to sanctions pursuant to the Code of Student Conduct. A copy of the Code of Student Conduct is attached to the Complaint as Exhibit C.  The Sexual Misconduct Policy prohibits "Sexual/gender-based violence."  This is defined as "physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent due to the person's use of drugs or alcohol." The Sexual Misconduct Policy defines "consent" as follows:

> Consent is informed, freely given, mutual, and can be withdrawn at any time. A person cannot give consent if he or she is mentally or physically incapacitated or impaired such that the person cannot understand the fact, nature or extent of the sexual situation; this includes impairment or incapacitation due to age, alcohol or drug consumption, or being asleep or unconscious. Similarly, a person cannot give consent if force, expressed or implied, duress, intimidation, threats or deception are used on the complainant. Silence or the absence of resistance does not necessarily imply consent. Consent to some sexual acts does not imply consent to other acts, nor does prior consent to sexual activities imply ongoing future consent with that person or consent to that same sexual activity with another person. Whether an individual has taken advantage of a position of influence or authority over an alleged victim may be a factor in determining consent.

Potential sanctions under the Code of Student Conduct include formal reprimand, disciplinary probation, suspension, dismissal, and other appropriate educational sanctions.  The Code of Student Conduct includes a set of "procedures" for investigating and resolving complaints.  Allegations of sexual misconduct by a student are investigated by the UC Title IX Office. The Code of Student Conduct requires that students be notified of university charges in writing. A student accused of violating the Code of Student Conduct is entitled to a hearing.

When a complaint of sexual misconduct is made, a Deputy Title IX Coordinator or designee will initiate a meeting with the accused student.  A Deputy Title IX Coordinator or designee will begin interviewing witnesses, as appropriate, and review relevant evidence. The complainant and the accused student are supposed to have an equal opportunity to provide documents and witnesses during the investigation and adjudication of the complaint.  At the conclusion of the investigation, the Deputy Title IX Coordinator prepares an investigatory report which is provided to an

4

Administrative Review Committee ("ARC"). The ARC holds an administrative hearing applying the preponderance of the evidence standard.

**B.     The Fall 2017 Incident And The UC Disciplinary Process**

Jane Roe is facing a suspension from UC for events that allegedly occurred beginning on the evening of September 30, 2017. On that date, Jane Roe had sexual contact with John Doe, allegedly while John Doe was intoxicated and unable to provide consent.

On September 30, 2017 Jane Roe attended a party with John Doe. Jane Roe had been drinking throughout much of the evening. She left the party with John Doe when John Doe said that he was drunk and wanted to go home. When they arrived at John Doe's house, John Doe invited Jane Roe inside. Jane Roe arranged to give John Doe some water and ibuprofen for an injury to his foot. She did not feel comfortable leaving John Doe and told him that she would not leave until he drank some water.

Jane Roe fell asleep on John Doe's bed. John Doe's roommates came into the room and asked her to leave, but she said that she was too dizzy to walk home. John Doe got into the bed and curled up next to James Roe. He started kissing her. They made out. John Doe removed Jane Roe's shirt and asked her to lock the door. While they were making out John Doe told Jane Roe to be quiet because "I think my roommates can hear" and digitally penetrated Jane Roe. Jane Roe asked John Doe if "There was anything else you want to do?" John Doe said "I think my roommates can hear. Let's go to sleep." Jane Roe left the house the next morning..

On October 2, 2017, John Doe submitted a report to the UC Title IX Office alleging that Jane Roe had engaged in sexual activity with him when he was intoxicated and, therefore, unable to provide consent. John Doe did not report that he penetrated Jane Roe; he reported only that he "thinks he touched Respondent's vagina." John Doe did not report the incident to the police. On

information and belief, John Doe was motivated to file a Title IX Complaint in retaliation for a prior Title X Complaint Jane Roe had filed against his friend.

On October 2, 2017, Defendant Karla Phillips, the school's Interim Title IX Coordinator, informed Jane Roe that the Title IX Office had received a report from John Doe and was beginning an investigation. Phillips assigned the report to Caitlin Wells, an employee in the Title IX office, to conduct the investigation. During the course of the investigation, Wells received information confirming that Jane Roe and John Doe had sexual contact. Wells wrote:

> [[I] t is not disputed that the sexual conduct occurred. Respondent stated that she and Complainant kissed and that Complainant digitally penetrated her. As such, the analysis moves to whether the sexual activity was consensual or nonconsensual.

Importantly for purposes of this Motion, Well *also* received information that Jane Roe was intoxicated. This information included: (i) statements from Jane Roe that she had been drinking; (ii) statements that Jane Roe did not want to leave John Doe's apartment because she was intoxicated; and (iii) witness statements in which Jane Roe stated that she was intoxicated. Wells, despite having information tat John Doe may have, also, violated the Sexual Misconduct Policy, did not investigate these potential violations, report the possible misconduct to the Title IX Office, or initiate any disciplinary proceedings.

UC conducted an ARC Hearing to determine if Jane Roe had violated the Student Code of Conduct. Jane Roe was found "responsible", or "guilty" at the hearing. Jane Roe submitted an appeal through the UC appeals process. This appeal was denied.

On February 26, 2018, Juan Guardia, in his role as Assistant Vice President for Student Affairs and Dean of Students, informed Jane Roe that she was suspended from UC until John Doe graduates or is no longer a student at UC. The letter indicated, "This decision is final and concludes the conduct process."

6

**ARGUMENT**

**A.    The Standard For Resolution Of This Motion**

The purpose of a preliminary injunction is to preserve the *status quo. Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996). In considering a preliminary injunction, the court considers four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *City of Pontiac Retired Employees Ass'n v. Schimmel,* 751 F.3d 427, 430 (6th Cir. 2014); *Ohio State Conf. of the NAACP v. Husted,* 768 F.3d 524, 532-533 (6th Cir. 2014).

**B.    Recent Cases Granting Preliminary Injunctions To Students**

In a number of recent cases federal courts have granted injunctive relief prohibiting schools from implementing discipline against students accused of sexual assault.

- In *Roe v. Adams-Gaston* S.D.Ohio No. 2:17-cv-945, 2018 U.S. Dist. LEXIS _____ (Docket #46, April 17, 2018), this Court granted a preliminary injunction prohibiting The Ohio State University from expelling a student who alleged that the school disciplinary proceedings violated her constitutional due process right of confrontation.

- In *Nokes v. Miami Univ.*, S.D.Ohio No. 1:17-cv-482, 2017 U.S. Dist. LEXIS 136880 (Aug. 25, 2017), this Court granted a preliminary injunction prohibiting a public university from suspending a student who had alleged that the school had acted in violation of his constitutional due process rights to notice and confrontation of adverse witnesses.

- In *Doe v. Pennsylvania State Univ.*, M.D.Pa. No. 17-CV-01315, 2017 U.S. Dist. LEXIS 132186 (Aug. 18, 2017), a court granted a preliminary injunction to student who had alleged that a school acted in violation of his due process right to confrontation in disciplinary proceedings

- In *Doe v. University of Cincinnati* 223 F. Supp. 3d 704 (S.D. Ohio 2016), *aff'd* 873 F.3d 393 (6th Cir. 2017) this Court granted a preliminary injunction prohibiting a pubic university from suspending a student who had alleged that the school had acted in violation of his constitutional due process right to confront adverse witnesses.

- In *Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 313 (D.R.I. 2016), the court concluded that school breached its contract with a student by the manner in which it conducted his disciplinary hearing on an allegation of sexual misconduct. The school was ordered to vacate its finding and sanction against the student and expunge his record.

- In *Doe v. Univ. of Notre Dame*, N.D.Ind. No. 3:17CV298, 2017 U.S. Dist. LEXIS 69645 (May 8, 2017), the court concluded that a student facing discipline for an allegation of sexual misconduct has demonstrated "at least some likelihood of success on the merits of his breach of contract claim and of irreparable harm." The school was ordered to stay it discipline of the student and permit him to sit for final examinations.

- In *Ritter v. Oklahoma*, W.D.Okla. No. CIV-16-043 8-HE, 2016 U.S. Dist. LEXIS 60193 (May 6, 2016), the court observed that "universities must ensure that the rights of both the accused and the accuser are protected." The school was ordered to stay any discipline and to permit a student facing discipline for an allegation of misconduct to attempt to complete all remaining graduation requirements.

- In *Doe v. Middlebury College,* D.Vt. No. 1:15-cv-192-jgm, 2015 U.S. Dist. LEXIS 124540 (Sep. 16, 2015), the court found that a student accused of sexual misconduct had "demonstrated a sufficiently serious question regarding whether [the school] violated its policies." The court ordered the school to not expel the student and allow him to remain enrolled in his courses.

- In *King v. DePauw Univ.*, No. 2:14-cv-70, 2014 U.S. Dist. LEXIS 117075 (S.D. Ind. Aug. 22, 2014), the court found that a student accused of sexual misconduct had demonstrated likely success on breach of contract claims against the school. The court prohibited the school from enforcing a suspension and ordered that the student be permitted to enroll in and attend the school without restriction.

These cases all represent situations where students who had credible evidence that a school employed an unfair or discriminatory disciplinary process has demonstrated sufficient facts to warrant the issuance of equitable relief on either a preliminary or permanent basis.

**C.     The Plaintiff Has A Substantial Likelihood of Success.**

Jane Roe has brought a claim pursuant to 42 U.S.C. § 1983 against the individual defendants in their official capacities for injunctive relief. The basis of this claim is that the individual defendants have violated Plaintiff's right to Equal Protection guaranteed by the Fourteenth Amendment to the United States Constitution. "The threshold element of an equal protection claim is disparate treatment." *Williams v. Richland Cty. Children Servs.*, 861 F.Supp.2d 874, 881 (N.D.Ohio 2011), *citing Howard v. City of Southfield*, 97 F.3d 1452, at *5 (6th Cir. 1996). *See also Thompson v. Ohio State Univ.*, 990 F.Supp.2d 801, 809 (S.D.Ohio 2014) ("in order to assert valid §1983 claims, Plaintiff must show that Defendants, while acting under color of state law, deprived her of a right secured by

the Federal Constitution or laws of the United States"), *citing Alkire v. Irving*, 330 F.3d 802, 813 (6th Cir. 2003).

The Fourteenth Amendment provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Under Sixth Circuit precedent, the Plaintiff, as a "class of one" may bring an equal protection claim when the defendants, acting under the color of state law,[2] has treated her differently from others similarly situated without a rational basis for doing so. *Warren v. City of Athens*, 411 F.3d 697, 710 (6th Cir. 2005).  The Supreme Court has "recognized that the Equal Protection Clause gives rise to a cause of action for a 'class of one.'" *Klimik v. Kent Cnty. Sheriff's Dep't*, 91 F. App'x 396, 400 (6th Cir. 2004), *citing Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).[3]

### 1. *Miami University*

In *Doe v. Miami Univ., supra*, the Sixth Circuit held that the Equal Protection guarantees of the Constitution are violated when a university administrator "had credible information that both [male and female] students had potentially violated the University's sexual misconduct policy" but chooses to "not to pursue disciplinary action against" one of the students.[4]   The gravamen of an equal

---

[2] Plaintiff does not anticipate that the defendants will dispute that they were acting under the color of state law.

[3] By proceeding under a "class of one theory," Plaintiff is not required to demonstrate that Defendants were predominantly motivated by a form of discrimination against her as a female. Instead, the plaintiff need only show that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.  *See Jan Rubin Assocs. v. Hous. Auth.*, E.D.Ky. No. 03-CV-160-DLB, 2007 U.S. Dist. LEXIS 24116, at *38 (Mar. 30, 2007) (discussing reason a plaintiff may proceed under the "rational basis" class of one theory).

[4] This Court dismissed an Equal Protection claim brought by a male student in *Gischel v. Univ. of Cincinnati*, S.D.Ohio No. 1:17-cv-475, 2018 U.S. Dist. LEXIS 18083 (Feb. 5, 2018).  One of the significant factors for the Court in *Gischel* was the belief that "the accuser cannot be the similarly situated individual to whom the accused student plaintiff is compared."  2018 U.S.Dist LEXIS

9

protection claim under *Miami Univ.* is the "unequal treatment" that arising out of a school administrator's "failure to initiate the University's disciplinary process with respect to" an alleged victim of the opposite gender "after receiving credible information that [the alleged victim] may have violated the sexual-misconduct policy." 882 F.3d at 597.

*Miami Univ.* involved a situation where a male and a female student had consumed alcohol and then engaged in sexual conduct. The female student later claim that some of the activity was not consensual. This accusation of sexual misconduct was evaluated by Miami University, and the male student was found responsible for violating the school's sexual-assault policy. The court observed that during the investigation of whether the male student had committed misconduct, the investigators and administrators had received information that the male student was intoxicated and, as a result, unable to provide consent to sexual activity. The court approved of an equal protection claim in this circumstance:

> [The administrator] knew that [the female student] had potentially violated the University's sexual misconduct provisions at the same time she reviewed the allegations against [the male student]. . . . [The administrator] chose to pursue disciplinary action against [the male student], but not [the female student]. . . . [The Administrator] had credible information that both students had potentially violated the University's sexual misconduct policy. [The administrator], however, chose not to pursue disciplinary action against the female student, but only against the male student. . .

882 F.3d at 596. Significantly, the Sixth Circuit: observed that "the exact alleged sexual misconduct of each student" need not be the same. 882 F3d at 597 ("we have not previously required a plaintiff

---

18083 at *20, *citing Doe v. Ohio State Univ.*, 239 F. Supp. 3d at 1067; *Doe v. Case W. Reserve Univ.*, No. 1:14cv2044, 2015 U.S. Dist. LEXIS 123680, at *6 (N.D. Ohio Sept. 16, 2015). This aspect of *Gischel* is contrary to the holding of *Miami Univ.*; in *Miami Univ.* the accuser was the similarly situated person to the whom the accused student plaintiff was compared by the Sixth Circuit. Notably, the *Miami Univ.* court did not require a formal complaint, but relied upon the mere awareness by the administrator of possible misconduct. *Compare Ohio State*, 239 F. Supp. 3d at 1067 (relying on fact that the similarly situated student was never formally accused of violating the code of student conduct).

to allege that the misconduct giving rise to an allegedly discriminatory disciplinary outcome be of the same type and degree"), *citing Heyne*, 655 F.3d at 571 (holding that the plaintiff sufficiently pleaded an equal-protection claim when he alleged that he was punished more harshly for running over another student's foot with his vehicle than the other student was for threatening the plaintiff's life because of the different races of the two students).

The accused student, if not pursuing a class of one theory, is also required to demonstrate that "the different treatment he received was based on 'purposeful or intentional' gender discrimination." 882 F.3d at 597, *quoting Smith v. City of Salem*, 378 F.3d 566, 577 (6th Cir. 2004). The plaintiff in *Miami Univ.* buttressed his § 1983 equal protection claims with evidence of discrimination, including assertions that the school faced external pressure from the federal government and lawsuits brought by private parties. 882 F.3d at 594. In particular, the Sixth Circuit credited allegations that the school would discriminate on the basis of gender "because it was a defendant in a lawsuit brought by a student who alleged that she would not have been assaulted if the University had expelled her attacker for prior offenses." 882 F.3d at 594.

### 2. Application Of *Miami Univ.* To This Case

This case presents similar facts to the Equal Protection claim in *Miami Univ.,* with the genders simply reversed. In this case, the UC Investigator had credible information that John Doe engaged in sexual activity with Jane Roe while Jane Roe was intoxicated, and, thus, unable to provide consent under he UC Code of Student Conduct. The Equal Protection problem arises because the investigator and UC Title IX personnel chose to not to pursue disciplinary action against John Doe.

Jane Roe had told investigators that she had been drinking at the party and was intoxicated. She also told the investigator that John Doe had initiated sexual contact and digitally penetrated her. This, under *Miami Univ.* should have been enough to cause the investigator and the UC Title IX Office to begin an investigation into whether John Doe engaged in sexual activity with Jane Roe

11

when Jane Roe was intoxicated and, under the terms of the UC Code of Conduct, unable to consent. Other witnesses confirmed the claim by Jane Roe that she was too intoxicated to engage in sexual activity. One witness, HG told the investigator that she spoke to Jane Roe about the incident. During this conversation Jane Roe indicated that she was drunk, John Doe kissed her first, and that she bled because John Doe had "fingered her hard." Another witness, W1, also discussed the Incident with Jane Roe. During this conversation Jane Roe told W1 that both she and John Doe were intoxicated and that John Doe had "fingered her." Finally, another witness, EP, confirmed that Jane Roe Jane Roe did not want to leave John Doe's residence because she was "dizzy" and needed some rest.

Under a "class of one" theory, UC did not have a rational basis to distinguish between Jane Roe and John Doe in the decision to not initiate disciplinary investigations or proceedings. The Sixth Circuit in *Miami Univ.* emphasized that the equal protection problem arises from the "failure to initiate the University's disciplinary process" and not on whether the student of the other gender actually received any discipline. 832 F.3d at 597 (observing that the disciplinary process against the other student "may have led to a finding of not responsible or the imposition of a lesser sanction). Alternatively, gender-based motivation may be inferred from the fact the UC is currently facing litigation from male students accusing the school of imposing discipline in a discriminatory manner. The Sixth Circuit in *Miami Univ.* also approved of this theory, observing that the school may have been motivated to discriminate in response to other litigation. 832 F.3d at 594.

This case is similar to a pre-*Miami Univ.* case brought under a similar selective enforcement theory. *Doe v. Amherst College*, 238 F. Supp. 3d 195 (D.Mass.2017). In *Amherst College*, the court found sufficient allegations to survive a motion for judgment on the pleadings on a selective enforcement claim where, as in this case, there was allegations that both the male and female students in the case

12

had engaged in sexual activity while the other student was intoxicated, yet only the male student was subject to discipline.  The court, in denying a motion for judgment on the pleadings, observed:

> [Plaintiff] alleges the College took proactive steps to encourage [the female student] to file a formal complaint against [Plaintiff] when it learned he may have been subjected her to nonconsensual sexual activity. But, when the College learned [the female student] may have initiated sexual activity with [Plaintiff] while he was "blacked out," and thus incapable of consenting, the College did not encourage him to file a complaint, consider the information, or otherwise investigate.

238 F. Supp. 3d at 223.

### D.    Irreparable Harm

The Complaint and Affidavit of Jane Roe describes the irreparable harm Jane Roe will suffer if a preliminary injunction is not granted.  Suspension from UC or the imposition of other discipline would deny Jane Roe the benefits of education at her chosen school, would damage her academic and professional reputations, and may affect her ability to enroll at other institutions of higher education and to pursue a career.   This has been found to constitute irreparable harm.  In *Doe v. Univ. of Cincinnati,* the Sixth Circuit observed that a suspended student would "suffer reputational harm both on and off campus based on a finding rendered after an unfair hearing."  872 F.3d 393 at *29.  *See also Elmore v. Bellarmine Univ.*, W.D.Ky. No. 3:18CV-00053-JHM, 2018 U.S. Dist. LEXIS 52564, at *20 (Mar. 28, 2018) (disciplinary sanctions "would damage [student's] academic and professional reputations and may affect his ability to enroll at other institutions of higher education or medical school and to pursue a career"), *citing Doe v. Cummins*, 662 Fed. Appx. 437, 445 (6th Cir. 2016); *Boman v. Bluestem Unified Sch. Dist. No. 205,* 2000 U.S. Dist. LEXIS 5389 (D. Kan. Jan. 28, 2000) (noting that suspension of student constitutes irreparable harm); *Tully v. Orr*, 608 F. Supp. 1222 (E.D.N.Y. 1985) (an Air Force academy cadet who was expelled right before final exams and graduation suffered irreparable harm); *Bhandari v. Trustees of Columbia Univ. in N.Y.,* 2000 U.S. Dist. LEXIS 3720, at *15-16 (S.D.N.Y. 2000) (suspension or expulsion from an academic institution may constitute irreparable harm).

13

In addition, Jane Roe has established potential constitutional violations. "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Bery v. City of New York*, 97 F.3d 689, 693 (2d Cir. 1996), *cert. denied*, 520 U.S. 1251 (1997). The Sixth Circuit in *Doe v. Univ. Of Cincinnati observed,* "When constitutional rights are threatened or impaired, irreparable injury is presumed." 872 F.3d 393 at *29, *quoting Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). Consistent with this presumption, courts have held that the denial of an injunction can "cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights." *McNeilly v. Land*, 684 F.3d 611, 620-21 (6th Cir. 2012) ("Once a probability of success on the merits was shown, irreparable harm followed . . . ."); *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978) ("[t]he existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest."); *Campbell v. Miller*, 373 F.3d 834, 840 (7th Cir. 2004) (Williams, J., dissenting) ("[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable harm is necessary").

## E.     Harm to Third Parties and Public Interest

In constitutional cases, an inquiry into the public interest is difficult to separate from the likelihood of success on the merits because "the public interest is promoted by the robust enforcement of constitutional rights." *Am. Freedom Def. Initiative v. Suburban Mobility for Reg. Transp.*, 698 F.3d 885, 896 (6th Cir. 2012). In this case, an injunction will not cause any harm to third parties or UC. UC remains able to enforce its rules and regulations in a manner consistent with constitutional and statutory requirements. Moreover, since Jane Roe has nearly completed her coursework, her presence on campus and interaction with the alleged victims would be limited. Moreover, any claim that Jane Roe would pose a threat to the community in undermined by the fact

14

that Jane Roe remained on campus for months after the Incident without any adverse events or action by UC.

Moreover, an injunction is also in the public interest. The Sixth Circuit has observed that an "injunction to protect . . . constitutional and civil rights . . . is always in the public interest." *Dodds v. United States Dep't of Educ.*, 845 F.3d 217, 222 (6th Cir. 2016), *citing G&V Lounge, Inc. v. Mich. Liquor Control Comm'n,* 23 F.3d 1071, 1079 (6th Cir. 1994); *Cohen v. Brown Univ.,* 991 F.2d 888, 906 (1st Cir. 1993). On the other hand, the failure to grant an injunction would harm the public because it would permit UC to violate the constitutional rights of all current and future students on an ongoing basis while this case is resolved, which necessarily would cause substantial, irreparable harm to those students. *Doe v. Lee*, U.S.D.C., D. Conn. No. NO. 3:99CV314, 2001 U.S. Dist. LEXIS 7282 (May 18, 2001) ("there is a distinct public interest in having this Court discharge its duty to protect and enforce [constitutional] rights").

## F.     Nominal Bond Should Be Imposed

Federal R. Civ. P. 65(C) provides that "The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

UC is an educational institution. Accordingly, because money is not an issue for the Defendants and the school is not likely to suffer any potential losses if an injunction is granted, this Court should set surety in the nominal amount of $1, the same amount set by this Court in *Univ. of Cincinnati*, 223 F. Supp. 3d 704 ("The Court sets a bond in the nominal amount of $1.").[5]  *See also Elmore*, 2018 U.S. Dist. LEXIS 52564, at *23 (finding "no bond is necessary" for injunction against school); *Ponce v. Socorro Indep. Sch. Dist.,* 432 F. Supp. 2d 682, 707 (W.D. Tex. 2006) (setting a nominal

---

[5] In *Nokes*, this Court found that no bond was required. 2017 U.S. Dist. LEXIS 136880, at *42.  In *Roe v. Adams-Gaston*, this Court set a nominal bond of $100.  2018 U.S. Dist. LEXIS _____ at *__.

bond of one hundred dollars because the evidence indicates that Defendant will suffer little, if any, damage by the issuance of the preliminary injunction), *rev'd on other grounds* 508 F.3d 765 (5th Cir. 2007). Courts have declined to require plaintiffs to post a bond in cases involving constitutional rights. S*ee Ogden v. Marendt*, 264 F. Supp. 2d 785, 795 (S.D. Ind. 2003); *Wickersham v. City of Columbia*, 371 F. Supp. 2d 1061 (W.D. Mo. 2005).

## CONCLUSION

Pursuant to Fed. R. Civil P. 65, this Court should, following a hearing, grant a Preliminary Injunction prohibiting Defendants from imposing any disciplinary sanctions against Jane Roe.

Respectfully submitted,

_____/s/ Joshua Adam Engel_____
Joshua Adam Engel (0075769)
Anne Tamashasky (0064393)
Jim Hardin (0056247) (admission pending)
ENGEL AND MARTIN, LLC
4660 Duke Drive, Ste. 101
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com