IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| JANE ROE, | Case No. 1:18-cv-00312-TSB |
| Plaintiff, | Judge BLACK |
| v. | SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION |
| UNIVERSITY OF CINCINNATI, ET AL. | |
| Defendants | |

Plaintiff Jane Roe respectfully submits this Supplemental Memorandum in support of the Motion for a Preliminary Injunction. This Motion is accompanied by the Declaration of Mark Wieczorek ("Wieczorek Decl.") and the Supplemental Declaration of Jane Roe ("Roe Decl."). Plaintiff also relies upon the UC Administrative Record and Hearing Transcripts (filed under seal at Doc#16). Plaintiff has also filed an Amended Complaint based on information received in discovery.

As a result of discovery provided by Defendants, Jane Roe is now proceeding on *two* legal theories to support the Motion for a preliminary Injunction:

1. The Equal Protection Claim described in the Original Memorandum and Complaint; and

2. A new Due Process Claim described *infra* and set forth in the Amended Complaint.

1

**ADDITIONAL FACTS: THE APRIL 2017 COMPLAINT**

On April 10, 2017, the University of Cincinnati ("UC") Title IX Office received a complaint alleging that Plaintiff was the victim of a sexual assault. The respondent in that case was another student in the ROTC program, CB. The April 2017 Complaint alleged that on or about April 8, 2017, CB had "Pulled [Jane Roe] onto his lap and put his hands under her shirt and touched her breasts. (Incident Report, #UC_00002). Plaintiff had first reported this matter to Major Ford of the UC ROTC Unit. Major Ford then reported the matter to the UC Title IX Office.

The UC Title IX Office conducted an investigation into the April 2017 Complaint. (*See, generally*, May 13, 2017 Report, #UC_00038-00050; Witness Statements and Exhibits to Report, #UC_0002-00037.) The investigation revealed that Plaintiff had been drinking on the night of the April 8, 2017. She explained that she did not initially react to the inappropriate touching due to a "mixture of . . . intoxication and I didn't really expect him to grab me." (Witness Statement, #UC_00011.) The investigation further revealed that Plaintiff had been texting with John Doe on that evening. After the alleged sexual assault by CB, Plaintiff sent the following two texts to John Doe:



2

(Report Exhibit, UC#00032.)[1] Plaintiff explained that CB was her ROTC squad leader, and that she sent the text message to John Doe because "… he had already touched me. I was afraid that he was going to do something else." (Witness Statement, UC#00011.)

John Doe was in the room when the alleged inappropriate sexual contact by CB occurred. When interviewed by the UC investigator, CB denied touching Plaintiff. John Doe was also interviewed. John Doe contradicted some of CB's testimony, including CB's claim that CB was not sitting next to Plaintiff. (*Compare* Witness Statements, #UC_0029 and #UC_00018.) John Doe also told the investigator that CB had, at one point, "grabbed [Plaintiff] and put her onto the couch" but explained that he did not observe the inappropriate sexual contact. (Witness Statement, #UC_00029)

On June 28, 2017 UC conducted an ARC hearing on the allegations of the April 2017 Complaint. Defendant Mitchell, who also chaired the hearing panel at issue in this case, chaired the hearing panel.[2] CB denied misconduct at the hearing and John Doe testified on his behalf. John Doe testified:

> what I saw from that night, the only thing that – contact between [CB] and [Plaintiff], other than talking, was when [Plaintiff] was standing in front of [CB], between him and the TV, he moved her onto the couch beside him and then we were all playing the [video] game after that.

(June 28, 2017 Hrg. at 63-64, #UC_00257.) Plaintiff also testified at the hearing. The committee ultimately found CB not responsible for the allegations in the April 2017 Complaint. (June 28, 2017 Hrg. at 83, #UC_00262.)

Even though UC found CB not responsible, CB was placed on a form of probation by the ROTC unit as a result of Plaintiff's complaint against him. Plaintiff explains in her Declaration that

---

[1] Other text messages from Plaintiff were consistent with her story. One message to a witness from that evening said, "CB scared me . . ." A previous message to a witness said, "Hey, so [CB] is hitting on me like a lot and idk what to do . . . he told me I was hot and then grabbed my ass." (Report Exhibits, #UC_00034-00035)

[2] Mitchell has been added as a defendant in the Amended Complaint.

3

this ultimately led to CB's dismissal from the ROTC program, and that CB, John Doe, and others blamed Plaintiff for his dismissal from the ROTC program:

> He was later expelled from the ROTC unit after he committed another, unrelated, violation of the rules. He likely would not have been expelled for this later violation had he not been placed on probation as a result of my complaint. CB and his friends, including John Doe, blamed me for CB's removal from the ROTC unit.

(Roe Decl. ¶3(c).)

## ADDITIONAL ARGUMENT

**A.     The Discovery Provided By UC Supports A Finding That Plaintiff Has A Substantial Likelihood of Success on Her Equal Protection Claim**

Jane Roe has brought a claim pursuant to 42 U.S.C. § 1983 against the individual defendants in their official capacities for injunctive relief. The basis of this claim is that the individual defendants have violated Plaintiff's right to Equal Protection guaranteed by the Fourteenth Amendment to the United States Constitution in a manner described in *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018). Plaintiff's claim is that UC failed to initiate the University's disciplinary process after receiving credible information that John Doe may also have violated the sexual-misconduct policy.

As noted in Plaintiff's original Memorandum, *Miami Univ.* involved a situation where during the investigation of whether the male student had committed misconduct, the investigators and administrators had received information that the male student was intoxicated and, as a result, unable to provide consent to sexual activity. The same evidence is present in this case.

During the investigation, the UC investigator received information that Plaintiff was intoxicated when she engaged in sexual activity with John Doe. (*See, generally,* November 27, 2017 Ivestigative Report, #UC_00197-216; Witness Statements and Exhibits, #UC_00114-00152.) Plaintiff told the investigator that she had played drinking games earlier in the evening (Witness Statement, #UC_00127 (Plaintiff "stated that she played flip cup and took shots").) Plaintiff also told the investigator that she fell asleep in John Doe's room, and that when she was awakened by John

4

Doe's roommates, she felt dizzy. The investigative report states: "[Plaintiff] stated that she told them that she was too dizzy to walk home." (Witness Statement, #UC_00128) She told the investigator that after complaining that she was dizzy, John Doe "curled up next to her and put his arm around her"; he subsequently kissed her and digitally penetrated her. (Witness Statement, #UC_00128). One of the witnesses confirmed Plaintiffs statement that she felt "dizzy." (Witness Statement, #UC_00121)[3] Other witnesses confirmed that Plaintiff had been drinking. (Witness Statement, #UC_00129) A third witness said Plaintiff and John Doe "both got intoxicated" at the party. (Witness Statement, #UC_00136) A picture from the night could reasonably be interpreted as showing Plaintiff in an intoxicated state. (Exhibit, #UC_00144)

At the hearing, Plaintiff testified that she had been drinking:

MS. MITCHELL: And approximately how many drinks did you have?

[JANE ROE]: I don't know exactly how many drinks. We played drinking games before arriving at the party. I drank vodka with some orange juice and beer during the party games.

(January 26, 2018 Hrg. at 21-22, #UC_00269-70.) Later, Plaintiff testified that she was "tipsy, not too drunk . . ."[4] (January 26, 2018 Hrg. at 24, #UC_00270)

Plaintiff also testified that, at John Doe's apartment, she did felt dizzy and that, a short time later, John Doe initiated sexual contact.. She testified:

I began to experience vertigo. I lied down on the edge of the bed and fell asleep. The next thing I remember is [John Doe's] roommates barging in the room and insisting I go home. . . I said no, that I was too dizzy and requested a minute to sit down. They took [John Doe] out of the room and when he returned, he was no longer wearing a shirt. He got in bed where I was already laying, and one of his roommates turned out the lights and shut the door. [John Doe] moved over to me and initiated the contact between us . . .

---

[3] This witness did not believe Plaintiff. (Witness Statement, #UC_00121)

[4] "Tipsy" might be sufficient to trigger the UC Title IX Policy, which prohibits sexual activity with a person who is "impair[ed] or incapacitate[ed] due to age, alcohol or drug consumption . . ." (Complaint Ex. C.)

(January 26, 2018 Hrg. at 24, #UC_00269).

Based on this information, the analysis from the court in *Miami Univ.* is applicable to this case: the administrators, investigators, and hearing panel all knew that John Doe had potentially violated the University's sexual misconduct provisions at the same time they were reviewing the allegations against Plaintiff. Yet, the school administrators, investigators and hearing officers chose to pursue disciplinary action against Plaintiff but not John Doe. *Compare* 882 F.3d at 596 (describing Equal Protection claim). Significantly, Plaintiff does not need the Court to determine that she did not commit misconduct in order to state a substantial likelihood of success on a Equal Protection claim; this claim is stated sufficiently to establish a substantial likelihood of success if the Court finds that the UC administrators, investigators, and hearing officers had credible information that both students had potentially violated the University's sexual misconduct policy, but chose not to pursue disciplinary action against the male student, but only against the female student.[5]

**B.     The Discovery Provided By UC Supports A Finding That Plaintiff Has A Substantial Likelihood of Success on Her Due Process Claim**

The Due Process violation in this case flows from the failure of UC to permit Jane Roe to effectively cross-examine her accuser and key witnesses.

**1.     Factual Basis**

Jane Roe was prohibited from asking questions about the April 2017 Complaint to CB and John Doe. These questions would have revealed the possible biases, prejudices, or ulterior motives that colored the testimony at the hearing. (*See* Wieczorek Decl. ¶7; Roe Decl. ¶6.) Plaintiff states:

> I wished to defend myself against the allegations by John Doe by claiming that, as a result of the April 2017 Complaint: (i) John Doe and CB were biased and not credible

---

[5] The fact that UC faced allegations in multiple prior lawsuits that it discriminated against males students provided UC with an incentive to discriminate against the female student in this case in order to 'even the scales.' *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1344 and n. 78 (11th Cir. 2011) (jury could infer that the racial animus that drove company "to fire the white non-supervisors during this time also led [defendant] to fire white supervisors" following an investigation).

6

because they harbored a grudge against me; and (ii) John Doe and CB were motivated to bring a complaint against Jane Roe in retaliation for the April 2017 Complaint.

(Roe Decl. ¶4. *See also* Wieczorek Decl. ¶4 (same).)

This happened in three ways.

First, Plaintiff and her attorney have both submitted declarations stating that a UC attorney in the Title IX office told them that Plaintiff would not be permitted to mention the April 2017 Complaint at her hearing or submit questions to John Doe or witnesses about the April 2017 Complaint. (Roe Decl. ¶5(a); Wieczorek Decl. ¶6(a).). This is consistent with a note from one of the hearing panel members emphasizing that the Panel should "disregard previous incidents."



(Notes, #UC_00UC 230)

Second, at a number of points during the hearing, witnesses started to refer to the April 2017 Complaint. The Chair of the Hearing Panel, Mitchell, stopped any testimony on this issue. For example, when one witness attempted to mention the April 2017 Complaint, Mitchell quickly stepped in to redirect the testimony:



(January 26, 2018 Hrg. at 124, #UC_00295). During CB's testimony, Mitchell not only stopped any testimony about the April 2017 Complaint, but attempted to re-frame CB's testimony in a misleading way:[6]



(January 26, 2018 Hrg. at 64, #UC_00280.)

---

[6] Mitchell appears to be re-framing CB's testimony as expressing a concern about John Doe's physical "safety." However, it appears that CB was really attempting to express a concern that Jane Roe would make an accusation of sexual misconduct against John Doe.

8

Third, despite the direction prior to the hearing, Plaintiff sought to submit a question to CB about the April 2017 Hearing. Plaintiff submitted the following question:



(Notes, #UC_00220.) It is unclear why the question is crossed out (or who crossed it out); but it is clear that the question is part of the record, it was submitted by Plaintiff, and was not asked of CB. (*See* Roe Decl. ¶5(b); Wieczorek Decl. ¶6(b).)

**2.      Legal Analysis**

In the Sixth Circuit, higher education disciplinary decisions implicate the Due Process Clause. *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005). Each particular situation may demand different procedural protections. *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976). The well known three-part *Mathews* test is:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335.

In college and university disciplinary hearings, the Due Process guarantees of the Constitution includes a right to effectively confront adverse witnesses when the information supplied by those

9

witnesses is the reason for the adverse actions and there is a question of credibility to be resolved by the finder of facts. *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970) ("in almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses"); *Winnick v. Manning*, 460 F.2d 545, 550 (2d Cir. 1972) ("if this case had resolved itself into a problem of credibility, cross-examination of witnesses might have been essential to a fair hearing"); *Flaim*, 418 F.3d 629, 641 (6th Cir. 2005) (when there is "a choice between believing an accuser and an accused, . . . cross-examination is not only beneficial, but essential to due process"); *Doe v. Cummins*, , 662 F. App'x 437 (6th Cir. 2016) ("due process may require a limited ability to cross-examine witnesses in school disciplinary hearings where . . . credibility is at issue"); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 401 (6th Cir. 2017) ("Accused students must have the right to cross-examine adverse witnesses 'in the most serious of cases.'"), *quoting Flaim*.

In this case, Plaintiff had the opportunity to ask questions of adverse witnesses; that is not the issue. Instead, the issue before the Court is whether Plaintiff had the opportunity to exercise this right *in an effective manner*. Courts, have observed that when persons have the right to cross-examination in civil-administrative hearings, the administrative agency must permit that right to be exercised in an effective manner. *Galvin v. New York Racing Assn.*, 70 F.Supp.2d 163 (E.D.N.Y.1998). In *Galvin,* for example, a track veterinarian facing a suspension stated a due process claim when the racing commission deprived him of "effective cross-examination" due to failure to present an investigative report through competent witnesses.[7] 70 F.Supp.2d at 178. In the context of social security hearings, courts have held that a claimant's right to procedural due process is violated where a claim is denied based upon post-hearing medical reports without giving the claimant an opportunity to cross-examine

---

[7] The *Galvin* court further observed that the ability of the veterinarian to present a defense did not ameliorate the due process problems, noting that the due process guarantees of the constitution insure a "meaningful, as opposed to a lengthy, hearing." 70 F.Supp.2d at 178.

10

the authors of those reports. *See Demenech v. Sec'y of the Dep't of Health & Human Servs.*, 913 F.2d 882, 884-85 (11th Cir. 1990); *Wallace v. Bowen*, 869 F.2d 187, 192 (3d Cir. 1989). These courts have observed that "effective cross-examination" is necessary to reveal what evidence the physician considered or failed to consider and how firmly the physician holds to the conclusions. *See Wallace*, 869 F.2d at 192; *Demenech*, 913 F.2d at 885.

The right to effectively cross-examine adverse witnesses is tied to the fundamental due process right to a hearing that is "meaningful," or as Justice Powell explained, "fair." *Vitek v. Jones*, 445 U.S. 480, 500, 100 S. Ct. 1254 (1980) (Powell, J., concurring in part) ("The essence of procedural due process is a fair hearing."). *See Doe v. Cummins,* 662 F.App'x 437 (6th Cir. 2016) (a student facing suspension is entitled to "the opportunity to be 'heard at a meaningful time and in a meaningful manner.'"), *quoting* 424 U.S. at 333; *Doe v. Rector & Visitors of George Mason Univ.*, E.D.Va. No. 1:15-cv-209, 2016 U.S. Dist. LEXIS 24847, at *46-47 (Feb. 25, 2016) ("it may well be that plaintiff deserves to be expelled or otherwise sanctioned for certain behavior, but the Constitution requires that if behavior is to be sanctioned, then the state must ensure the soundness of the decision it reaches as the situation requires."). The purpose of cross-examination – in school disciplinary hearings as in trials – is to find the truth. "Few procedures safeguard accuracy better than adversarial questioning." *Univ. of Cincinnati*, 872 F.3d at 401. *See also Newsome v. Batavia Local School Dist.*, 842 F.2d 920, 923-24 (6th Cir.1988) ("the value of cross-examination to the discovery of truth cannot be overemphasized"), *citing Davis v. Alaska*, 415 U.S. 308, 316 (1974) ("Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested."); *Furey v. Temple Univ.*, 884 F.Supp.2d 223, 251-252 (E.D.Pa. 2012) ("The purpose of cross-examination is to ensure that issues of credibility and truthfulness are made clear to the decision makers. Given the importance of credibility in this Hearing . . . the Court considers this an important safeguard.").

Plaintiff has a substantial likelihood of success on the merits of showing that the exclusion of all evidence and questions about the April 2017 Complaint deprived Plaintiff of an opportunity for effective cross-examination of key adverse witnesses. Applying the three-part *Mathews* test leads to this result:

(1) The private interest that will be affected by the official action:

The Sixth Circuit has explicitly held that private interest at stake in school disciplinary hearings "is substantial." *Univ. of Cincinnati*, 872 F.3d at 406.

(2) The risk of an erroneous deprivation and the probable value, if any, of additional or substitute procedural safeguards:

The April 2017 Complaint was probative on the central issue of Plaintiff's guilt, as it directly called into question the potential bias of the key witnesses The evidence was not speculative; all of the witnesses were aware of the April 2017 Complaint and would not have been surprised to be questioned on this topic. As a result, the exclusion of the evidence of the April 2017 Complaint significantly hindered Plaintiff's defense and denied the hearing panel the opportunity to assess the credibility of the adverse witnesses. Her advisor, an attorney, explains:

> Jane Roe sought to defend herself against the allegations by John Doe claiming that, as a result of the April 2017 Complaint: (i) John Doe and CB were biased and not credible because they harbored a grudge against Jane Roe; and (ii) John Doe and CB were motivated to bring a complaint against Jane Roe in retaliation for the April 2017 Complaint.

(Wieczorek Decl. ¶5.)

(3) The government's interest:

UC already allows accused students to pose questions to witnesses at certain disciplinary hearings. Allowing questions about motive would not pose any additional administrative burden on UC.

This Court recently held that the inability of a student to effectively cross-examine his accuser on issues of credibility violated the student's right to due process. *Doe v. Ohio State Univ.*, S.D.Ohio No. 2:15-cv-2830, 2018 U.S. Dist. LEXIS 68364 (Apr. 24, 2018). In *Ohio State*, this Court, on a summary judgment standard, considered a situation that resembled this case in many respects. The alleged victim claimed that she was too drunk to consent to sexual activity, but generally did not recall

12

the sexual encounter. The accused student claimed that the alleged victim appeared relatively sober and consented to and actively participated in sexual activity. The disciplinary board, relying in part on testimony from witnesses, resolved the issue of credibility by finding that the alleged victim was too intoxicated to consent to sexual activity and that the accused student had violated Ohio State's sexual misconduct policy. This Court described the situation the essential question the Board had to answer as follows:

> Other than conflicting third-party testimony, the proof of her intoxication comes down to who you believe: John Doe, or Jane Roe. One might ask: what reason would Jane Roe have for making this up?

2018 U.S. Dist. LEXIS 68364, at *21. The same question, "what reason would John Doe have for making this up" could be said about this case. As in this case, the student in *Ohio State* was permitted to question his accuser, but was not able to question her on a key fact that went to her motivate to fabricate or exaggerate.[8] This Court found that this could create a due process violation. This Court, applying the *Mathews* test said, "Without the opportunity to cross-examine [the complainant] on her motive to lie, the risk of erroneously disciplining [the accused student] was high." 2018 U.S. Dist. LEXIS 68364, at *29-30.

This Court, also recently, considered precisely this question in *Gischel v. Univ. of Cincinnati*, S.D.Ohio No. 1:17-cv-475, 2018 U.S. Dist. LEXIS 18083 (Feb. 5, 2018). In *Gischel*, this Court considered whether, following *Doe v. University of Cincinnati*, a due process violation could arise if the adjudicative panel refused to ask entire categories of questions the accused student deemed critical to his or her defense. The UC panel in *Gischel* refused to ask questions proffered by an accused student in a Title IX/Sexual Misconduct adjudication about the bias of the investigator due to his alleged

---

[8] In *Ohio State*, the alleged victim was threatened with expulsion from medical school and was able to remain in school because she claimed to be the victim of a sexual assault.

13

"romantic feelings" the complainant.[9] This Court concluded, on a motion to dismiss standard, that the failure of the panel to ask questions designed to show the bias of witnesses constituted a plausible procedural due process claim. 2018 U.S. Dist. LEXIS 18083, at *36-37.[10]

This Court's decisions in *Ohio State* and *Gischel* should apply in this case. In *Ohio State*, the plaintiff "couldn't effectively cross-examine [the accused student] on a critical issue: her credibility, and specifically, her motive to lie." 2018 U.S. Dist. LEXIS 68364, at *30. In *Gischel*, a UC hearing panel refused to ask entire categories of questions the plaintiff sought to ask designed to show the bias and lack of credibility of key witnesses. Similarly, in this case, Plaintiff was prohibited from asking questions about the bias and motive to lie of not only the alleged victim, but also a key witness. While the mechanism for this deprivation in *Ohio State* and *Gischel* was slightly different – in *Ohio State* the school withheld the impeachment evidence and in *Gischel* one of the witnesses never appeared at the hearing -— the result is the same: the procedural due process right of the accused students were violated because the accused students could not effectively cross examine their accusers on issues of credibility. *See also Newton v. Kemna,* 354 F.3d 776, 781 (8th Cir.2004) ("one goal of effective cross-examination is to impeach the credibility of opposing witnesses").[11]

---

[9] The Panel also refused to ask additional categories of questions, including whether the alleged victim gave inconsistent or inaccurate statements. 2018 U.S. Dist. LEXIS 18083 at *37.

[10] This Court in *Gischel* distinguished between the official capacity and individual capacity claims, holding that the defendants in their individual capacities were entitled to qualified immunity. 2018 U.S. Dist. LEXIS 18083 at *38. The issue of qualified immunity is not relevant to the question of injunctive relief before the Court. "Qualified immunity does not prohibit the issuance of a preliminary injunction." *Mattia v. City of Ctr. Line*, E.D.Mich. No. 17-11169, 2017 U.S. Dist. LEXIS 207611, at *32 (Dec. 18, 2017), citing *Ward v. Polite*, 667 F.3d 727, 742 (6th Cir. 2012) ("Qualified immunity shields government officials from monetary damages, not from injunctive relief.") *See also Smith v. Leis*, 407 F. App'x 918, 930 (6th Cir. 2011) ("[A] court could award both declaratory and injunctive relief in an action against a defendant protected by qualified immunity."); *Collyer v. Darling*, 98 F.3d 211, 222 (6th Cir. 1996) ("[I]mmunity only precludes claims for monetary damages against officials in their individual capacities, and not claims for injunctive or declaratory relief.").

[11] The Court, understandably, does not wish to be in a position of having to second-guess school evidentiary rulings. That is not the issue in this case, just as it was not the issue in *Gischel*. The Court does not need to find that right to unlimited cross-examination exists in every case to grant this

14

## CONCLUSION

Pursuant to Fed. R. Civil P. 65, this Court should grant a Preliminary Injunction prohibiting Defendants from imposing any disciplinary sanctions against Jane Roe.

Respectfully submitted,

    /s/ Joshua Adam Engel
Joshua Adam Engel (0075769)
Anne Tamashasky (0064393)
Jim Hardin (0056247) (admission pending)
ENGEL AND MARTIN, LLC
4660 Duke Drive, Ste. 101
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been electronically served via the Court's CM/ECF system this 28th day of June upon all counsel of record.

    /s/ Joshua Adam Engel
Joshua Adam Engel (0075769)

---

Motion; the Court can simply find that this obligation exists in this case with respect to information that would show a witness was biased or had motive to fabricate.