**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **Jane Roe** | ) | Case No. 1:18-cv-312 |
| | ) | |
| Plaintiff, | ) | JUDGE TIMOTHY S. BLACK |
| | ) | |
| vs. | ) | **DEFENDANTS' MOTION TO DISMISS** |
| | ) | **PLAINTIFF'S AMENDED** |
| **University of Cincinnati, *et al.*** | ) | **COMPLAINT** |
| | ) | |
| Defendants. | ) | |

Under Fed. R. Civ. P. 12(b)(6), Defendants the University of Cincinnati ("UC"), Karla Phillips, Catlin Wells, Juan Guardia, and Aniesha Mitchell move to dismiss Plaintiff's Amended Complaint. (Doc. 17). This is another in a line of recent Title IX and due process cases brought by a college student who claims unfair discipline stemming from an alleged sexual assault after a night of drinking. But this case is unique. Here, unlike in previous cases, the disciplined-student/plaintiff is a female – Jane Roe – who was found responsible for violating UC policy by engaging in sexual activity with a male student who was too incapacitated to consent.

Boiled down, Jane Roe's ("Roe") case hinges on establishing that she was similarly-situated to her male accuser, John Doe ("Doe"), such that UC's Title IX investigation and discipline of her, but not him, was discriminatory. Her lone allegation in support of that unsubstantiated conclusion: she was also drinking that night. In Roe's view, that means UC should have also investigated whether Doe violated UC's policies by engaging in sexual conduct with her, and the fact that UC did not launch an investigation into the alleged victim means her own rights were violated. That argument hides the ball. **Roe never claimed to have been sexually assaulted. Roe never claimed to have been incapacitated. Roe never claimed she did not consent.**

In fact, Roe's allegations are to the contrary.  Roe always maintained, and still maintains, that she was a willing participant in the sexual activity and that she "constantly" asked Doe whether he wanted to continue with the relations.  Of course, Roe does that to deflect Doe's allegations that he was assaulted or that she did anything wrong.  No matter, the point here is Roe and Doe demonstrably are not similarly situated to each other because while Doe claimed incapacitation and the absence of consent, Roe said the opposite – that she consented and she believed Doe did too.  Whether Doe actually consented, or instead was too incapacitated to do so, was the sole issue to be decided at the disciplinary hearing.  And whether UC got that answer right is not before the Court.

Instead, this case is about whether UC treated Roe differently than her male accuser on the basis that she is female, and him male.  Even on the face of the pleadings, it is clear UC did not treat Roe differently based on her gender.  UC initiated a Title IX investigation of Roe because another student alleged she sexually assaulted him.  Meanwhile, no one, including Roe, ever claimed Roe was sexually assaulted or did not consent, whether due to incapacitation or otherwise.  Her argument that "they were both drinking that night so they were similarly situated" is not the law.  Were it so, anyone who is sexually assaulted by another student who had consumed alcohol would be disincentivized to come forward to report the assault for fear of being disciplined himself or herself.  That is all-too-frequently the scenario in university sexual assault cases, where a sexual encounter follows a night of drinking.  The purposes underlying Title IX would be undone in one fell swoop if victims feared being disciplined themselves for braving to report being assaulted.  Simply put, one student who maintains the sex was consensual and never claims incapacitation cannot be similarly situated to another who claims incapacitation and lack of consent.

Finally, Roe also alleges a due process violation in not being permitted to cross-examine Doe and another witness regarding an alleged assault that Roe experienced months prior. However, it is well-established that university disciplinary proceedings are not akin to criminal trials. Cross-examination is not a fundamental right in these cases unless the issue turns on one of credibility – e.g., a "he-said-she-said" between a victim and accuser. That is not the case here. Several people described Doe that night as extremely intoxicated, to the point of vomiting and slurring his words. Most telling, Jane Roe herself did not feel comfortable leaving Doe alone because of his state, and she promised his roommates, who wanted her to leave, that she was only staying there to make sure he was okay. The alleged bias of other witnesses has nothing to do with that, so unlimited cross-examination was not required.

The Complaint should be dismissed.

Respectfully submitted,

/s/ Eric K. Combs
Eric K. Combs (0067201)
Andrew B. Cassady (0092413)
DINSMORE & SHOHL LLP
255 E. Fifth Street, Suite 1900
Cincinnati, Ohio 45202
eric.combs@dinsmore.com
andrew.cassady@dinsmore.com

*Attorneys for Defendants The University of Cincinnati, Karla Phillips, Catlin Wells, and Juan Guardia*

# TABLE OF CONTENTS AND SUMMARY OF ARGUMENT

I.   INTRODUCTION .................................................................................................1

II.  ALLEGED FACTS...............................................................................................3

III. LAW AND ARGUMENT.......................................................................................7

   A. Roe's Declaratory Judgment/Equal Protection Claim fails.............................9

       i.  Roe does not sufficiently allege the existence of a similarly-situated male
           who was treated more favorably than her. ...................................................9

A student complaining of being sexually assaulted is not a comparator to the person he/she is accusing for purposes of an equal protection or Title IX claim, and the Sixth Circuit's decision in *Miami Univ.* did not change that law. Doe alleged assault and lack of consent. Roe claimed the opposite. *Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048 (S.D. Ohio 2017); *Doe v. Baum*, 227 F. Supp. 3d 784 (E.D. Mich. 2017); *Doe v. Case W. Reserve Univ.*, No. 1:14CV2044, 2015 U.S. Dist. LEXIS 123680 (N.D. Ohio Sept. 16, 2015).

       ii. Even assuming Doe could be a similarly-situated comparator, Roe has not
           sufficiently pled purposeful or intentional discrimination by UC. ...........18

In addition to identifying a similarly-situated member of the opposite sex that received more favorable treatment, a plaintiff must also allege the disparate treatment was motivated by gender discrimination. There are no allegations to support the conclusion that UC investigated and disciplined Roe because she was female and not male. *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018); *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586 (S.D. Ohio 2016); *Doe v. College of Wooster*, N.D. Ohio No. 5:16-cv-979, 2017 U.S. Dist. LEXIS 38851 (Mar. 17, 2017).

   B. Roe's Equal Protection/42 U.S.C. § 1983 Claim fails. ...................................20

       i.  Count II is premised on the same insufficient allegations as Count I........20

       ii. The Individual UC Defendants are immune from suit in their personal
           capacities. ................................................................................................20

A public official is immune from damages claims if his or her conduct does not violate a clearly established statutory or constitutional right of which a reasonable official would have known. The law in the university disciplinary context points in the direction of less rights for an accused, not more. *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586 (S.D. Ohio 2016); *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018).

   C. Roe's Due Process Claim fails..........................................................................22

Before suspending or expelling a student, the law simply requires notice, an explanation of the charges and evidence, and an opportunity to be heard. Once that process is given, courts should refrain from second-guessing the disciplinary decisions made by school administrators. And, unfettered cross-examination is not required. Although some

circumscribed form of cross-examination may be necessary where the case hinges on the credibility of victim and accused, that is not the situation here. *Ashiegbu v. Williams*, 6th Cir. No. 97-3173, 1997 U.S. App. LEXIS 32345 (Nov. 12, 1997); *Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048 (S.D. Ohio 2017); *Doe v. Univ. of Cincinnati*, 872 F. 3d 393 (6th Cir. 2017); *Doe v. Loh*, No. PX-16-3314, 2018 U.S. Dist. LEXIS 53619 (D. Md. Mar. 29, 2018).

**D. Roe's Due Process/42 U.S.C. § 1983 Claim fails**.................................................27

**i.** <u>Count IV is premised on the same insufficient allegations as Count III</u> ...27

**ii.** <u>The Individual UC Defendants are immune from suit in their personal capacities</u>. ...............................................................................................27

A public official is immune from damages claims if his or her conduct does not violate a clearly established statutory or constitutional right of which a reasonable official would have known. The law in the university disciplinary context points in the direction of less rights for an accused, not more. In fact, even in cases where due process claims have survived a dispositive motion, courts still routinely grant qualified immunity. *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586 (S.D. Ohio 2016); *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018); *Gischel v. Univ. of Cincinnati*, No. 1:17-cv-475, 2018 U.S. Dist. LEXIS 1808 (S.D. Ohio Feb. 5, 2018).

**E. Roe's Selective Enforcement Claim fails.** ...........................................................29

Roe's selective enforcement claim overlaps with her equal protection claims. Roe did not adequately allege that UC disciplined her because she is female rather than male. And, Doe is not a comparator to Roe for purposes of a selective enforcement analysis because, unlike Doe, Roe does not claim sexual assault, incapacitation, lack of consent, or inability to consent. Roe's position – that if both victim and accused have consumed alcohol, they both must be investigated by the university – is not UC policy or the law. *Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048 (S.D. Ohio 2017); *Doe v. Baum*, 227 F. Supp. 3d 784 (E.D. Mich. 2017); *Doe v. Case W. Reserve Univ.*, No. 1:14CV2044, 2015 U.S. Dist. LEXIS 123680 (N.D. Ohio Sept. 16, 2015).

**IV.** **CONCLUSION** ..........................................................................................................31

<u>**MEMORANDUM OF LAW**</u>

**I.  INTRODUCTION**

It is well-established within the Sixth Circuit, and elsewhere, that a student who alleges sexual assault against another (a "complainant" in Title IX parlance) typically cannot be a comparator to the accused (a "respondent") for purposes of determining whether a university treated them differently.  In other words, a student accused of sexual assault and found responsible for violating a school's policies cannot later point to his or her accuser as a similarly-situated person by which to compare the university's response to state a plausible equal protection or selective enforcement claim. *Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048, 1067-68, 1082-83 (S.D. Ohio 2017); *Doe v. Case W. Reserve Univ.*, No. 1:14CV2044, 2015 U.S. Dist. LEXIS 123680, *15-16 (N.D. Ohio Sept. 16, 2015).

This February, the Sixth Circuit decided *Doe v. Miami Univ.*, 882 F. 3d 579 (6th Cir. 2018).  As is evident by her accompanying Motion for Preliminary Injunction, Roe believes *Miami Univ.* changed that law and now uniformly permits a student complaining of sexual assault to be a comparator to the accused for purposes of pleading and proving a gender discrimination claim.  That is a vast over-read of the *Miami Univ.* case.  And, indeed, the Sixth Circuit did not purport to overrule prior precedent in this regard.

Instead, what that case actually stands for is that where the accused student (there, a male) was so drunk that he blacked out and could not remember the sexual encounter – thus evidencing his own incapacitation – he can later state a cognizable Title IX and equal protection claim where the university fails to investigate whether the female complainant (who was sober) violated school policy herself by engaging in sexual acts with someone who was unable to consent.  That unremarkable holding simply means that if a school receives information that a

complaining student may have violated the university's Title IX policies by pursuing sexual activities with a person who was too incapacitated to consent (and who the complaining student later accuses of sexual misconduct), then the school must at least investigate whether the respondent was likewise taken advantage of by the complainant.

The incapacitated-accused-student/sober-complaining-student scenario present in *Miami Univ.* is in stark contrast to what happened in this case. Here, unlike Doe, Roe did not black out from being intoxicated. She did not lose any of her memory. She did not vomit. She did not need help walking home. She did not need water and ibuprofen. She purports to have a complete recollection of the night's events, and, critically, **never claimed to be so incapacitated that she did not recall what happened or that she did not consent**.

To the contrary, Roe claims she was a willing participant, even asking Doe repeatedly whether he wanted to keep going. That explains why, unlike Doe, Roe never reported a sexual assault complaint to UC. Roe never alleged incapacitation or lack of consent. Throughout her numerous interviews with UC's Title IX Office, the ARC hearing, and even now in her Complaint, Roe not once says she did not recall the sexual activity, did not want the sexual activity, did not consent to the sexual activity, or did not have the ability to so consent.

Whether Doe was actually incapacitated or not, or whether Roe should have known that, is not before this Court. The import of *Miami Univ.*, and the cases that came before it (which the Sixth Circuit did not overrule), is that Roe – who says she consented – cannot be similarly situated to Doe – who says he did not consent and instead was too drunk to recall what happened. Roe's own allegations that she willingly kissed Doe and carefully asked him whether he wanted to do anything else of a sexual nature only prove the point. Therefore, because Doe is

not similarly-situated to Roe for purposes of assessing UC's response to each, Roe's equal protection and Title IX claims fail as a matter of law.

Roe's due process claims also fail. The crux is that Roe wanted to cross-examine two of the witnesses at the ARC hearing about a prior sexual assault Roe allegedly experienced in the spring of 2017. She believes such questions could have indicated a bias on the part of the witnesses. However, it is well-established that there is no absolute right to cross-examination in the university setting, and certainly no right to ask an unlimited number of questions. The lone situation in which courts have required some form of cross-examination is where the ARC panel is faced with believing the story of either the complainant or respondent – i.e., where their credibility determines the whole case. That is not the situation here: various witnesses testified about Doe's level of intoxication; Doe's roommates all asked Roe to leave because they were worried about him; and Roe herself acknowledged that night and again later that she was worried about Doe and refused to leave until she was sure that he was safe. In light of the corroborating testimony, and most particularly Roe's own statements, there was no need for unfettered cross-examination of the alleged bias of anyone else. Roe had notice, an opportunity to be heard, and an opportunity to call her own witnesses and conduct some cross-examination of all the others. No more process was required. UC's disciplinary process is not a criminal trial.

## II. ALLEGED FACTS

### A. The September/October 2017 Incident

This case arises out of a sexual encounter between two UC students in the late night/early morning hours of September 30-October 1, 2017. (Doc. 17 at PAGEID ## 583-84, ¶ 47). Roe and Doe, both UC students and ROTC members, attended an off-campus party where drinking was involved. (*Id*.). By all accounts, Doe was extremely intoxicated and was seen throwing his

arms around others at the party and asking people to take several shots with him. (*Id.* at PAGEID ## 585-88). At some point in the early morning hours of October 1, Roe asked Doe to leave the party with her. (*Id.*). They walked back to his house, where Roe gave him some water and ibuprofen. (*Id.*). Apparently, Roe "did not feel comfortable leaving John Doe and told him that she would not leave until he drank some water." (*Id.*).

Doe's roommates were similarly concerned for him. They asked Roe to leave, telling her that they would watch over him. (*Id.*; *see also id.* at PAGEID ## 586-88, ¶¶ 56-59). In statements they provided to UC in the Title IX investigation that followed, Doe's roommates described his state that night:

- CP heard Doe vomiting. (*Id.* at PAGEID # 586, ¶ 56).

- TB said Doe was "definitely inebriated" and also observed Doe vomiting. (*Id.* at PAGEID # 587, ¶ 57).

- EP described Doe as "pretty drunk." (*Id.* at PAGEID # 588, ¶ 59).

Because of his state, all of Doe's roommates confirmed they asked Roe to leave numerous times and told her they would take care of Doe. (*Id.* at PAGEID ## 586-88, ¶ 56(c); ¶ 57(c); ¶ 59(b)). Roe assured them, "I promise you, nothing is going to happen. I'm just gonna give him his water, look him over, that's it." (*Id.* at ¶ 56(c)). At 1:17 a.m., Roe similarly texted one of her friends, who had also been at the party, that she was "not leaving John Doe until he's okay." (*Id.* at PAGEID ## 587-88, ¶ 58(d)).

Despite being asked to leave – and in spite of Roe's: (1) professed concern for Doe, (2) insistence that he drink water and take ibuprofen before leaving, (3) supposed discomfort in leaving him alone (notwithstanding his three roommates who were there), and (4) her "promise" to those roommates that "nothing is going to happen" – Roe says she got into bed with Doe, they "made out," and Doe "touched her" and "digitally penetrated" her. (*Id.* at PAGEID ## 583-84, ¶

47). Roe alleges that she locked the door, willingly kissed Doe, and asked him "if there was anything else [he] wanted to do," but he replied, "Let's go to sleep." (*Id.*).

Roe left the next morning. (*Id.*). The following day, October 2, Doe made a Title IX report with UC, accusing Roe of violating UC's Title IX Grievance Procedure by engaging in sexual activity with him while he was incapacitated and thus unable to consent. (*Id.* at PAGEID ## 584-86, ¶¶ 48-54). Under UC's Title IX Policy, consent is defined as "informed, freely given, mutual, and can be withdrawn at any time. A person cannot give consent if he or she is mentally or physically incapacitated or impaired such that the person cannot understand the fact, nature, or extent of the sexual situation; this includes impairment or incapacitation due to age, alcohol or drug consumption, or being asleep or unconscious . . . ." (*Id.* at PAGEID # 575, ¶ 28).

By Doe's telling, he drank a lot that night, including numerous beers and shots. (*Id.* at PAGEID ## 585-86, ¶ 54). He recalls walking home with Roe and needing to lean on her for support because he was stumbling. (*Id.*). He also recalls vomiting when they got to his house, after which point Roe gave him "a couple of pills." (*Id.*). When Doe got into bed, Roe had taken her clothes off and said, "fuck me" and "stick it in me." (*Id.*). Doe said "no." (*Id.*).

According to Doe, the next memory he had was waking up the following morning with blood on his hands and sheets. (*Id.*). Although he did not remember doing so, he deduced that he had digitally penetrated Roe. (*Id.*). He didn't think they had sex because he did not see any condoms, but he could not know for sure. (*Id.*). Doe told UC that he would not have engaged in sexual activity with Roe if he had been sober and that he did not consent to whatever had happened. (*Id.*). Since it was undisputed that Roe and Doe had engaged in some sexual activity, the sole issue to be fleshed out and decided through the Title IX investigation was "whether the sexual activity was consensual or nonconsensual." (*Id.* at PAGEID # 589, ¶ 63).

UC notified Roe of Doe's allegations. (*Id*. at PAGEID # 584, ¶ 49). UC's Title IX Office investigated. (*Id*. at PAGEID ## 584-89). UC interviewed Doe, Roe, and at least five witnesses who saw or interacted with Doe and Roe that night. (*Id*.). UC gathered and reviewed the witness summaries, complaint forms, and email correspondence. (*Id*.). And, after over a month-long investigation, UC conducted an Administrative Review Committee ("ARC") hearing to determine if Roe had violated UC's Student Code of Conduct. (*Id*. at PAGEID # 590, ¶ 67).

After a full investigation and ARC hearing in which Roe was able to participate and call witnesses, the ARC panel found her responsible for violating the Code of Conduct by engaging in sexual activity with a student who was incapacitated, and thus could not consent. (*Id*.). Roe appealed. (*Id*. at PAGEID # 594, ¶ 71). Her appeal was denied. (*Id*. at ¶ 72). The ARC panel's decision stood, and Roe was suspended effective immediately. (*Id*. at ¶ 64). Roe remains suspended until Doe graduates or is no longer a UC student. (*Id*.).

### B. The Irrelevant April 2017 Incident

Although it has nothing to do with whether Doe consented, or was able to consent, to Roe's sexual advances in the early morning hours of October 1, 2017, Roe emphasizes a sexual harassment charge she made against another UC student six months prior, in April 2017. (*Id*. at PAGEID ## 581-83, ¶¶ 40-44). That spring, Roe alleged she was sexually assaulted by another ROTC student, "CB," prompting an investigation and disciplinary proceedings by UC's Title IX Office. (*Id*.). Roe alleges Doe was "pissed" that Roe had reported CB, and thus hatched this grand conspiracy – essentially, to fabricate incapacitation and lie about being sexually assaulted – as "revenge for Jane Roe reporting an alleged sexual assault by CB." (*Id*.).

For starters, that is complete speculation and is unsupported by any well-pled factual allegations in the Complaint. Indeed, Roe's conspiracy claim does not line up with the reams of

other witnesses who saw Doe that night and who noted his vomiting, difficulty walking, and obvious incapacitation. (*Id*. at PAGEID ## 586-89). Nor does it line up with Roe's admitted concern for Doe based on how drunk he was and her accompanying "discomfort" about leaving him alone. (*See id*.). Equally fatal, these allegations of a conspiracy are directed against Doe and CB, ***not*** UC or any of the individually-named Defendants. (*See id*. at PAGEID # 150, ¶ 59 ("John Doe and CB had incentive to exaggerate or distort information as revenge . . . .")). This case is against UC, not Doe or CB. Therefore, absent any allegations that UC somehow sought revenge against Roe or had motivation to find her responsible (which there are not), this prior sexual assault claim and investigation are irrelevant and simply added in an attempt to create questions regarding UC's process.

### III. LAW AND ARGUMENT

University disciplinary proceedings are not, and should not be, akin to criminal trials. Time and again, courts – including recently this Court -- have held that their role is not to second-guess school administrators or re-litigate the facts of student disciplinary hearings – e.g., in the sexual assault context, to determine whether or not the male or female was actually assaulted or whether consent was given or capable of being given. *Doe v. Miami Univ.*, 882 F. 3d 579, 600 (6th Cir. 2018), citing *Flaim v. Med. College of Ohio*, 418 F. 3d 629 (6th Cir. 2005) ("A university is not a court of law, and it is neither practical nor desirable it be one."); *Schoewe v. Univ. of Cincinnati*, S.D. Ohio No. 1:17-cv-504 (June 15, 2018), Doc. No. 7, Order Granting Defendant's Motion to Dismiss, p. 9 ("the Court heeds the guidance of the Supreme Court that courts 'should refrain from second-guessing' a university's disciplinary decisions."); *Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048, 1080 (S.D. Ohio 2017) (as long as some kind of notice and a hearing are afforded to a student, "courts should refrain from second-guessing the

disciplinary decisions made by school administrators"); *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 755 (E.D. Tenn. 2009) ("the law does not allow this Court to retry the University's disciplinary proceeding").

Because of this, students who challenge disciplinary action by their schools must point to some defect in either the process they were afforded or the uneven manner in which the school enforced its policies. Here, Roe challenges her suspension on two grounds: (1) UC disciplined her and not Doe, purportedly evidencing gender discrimination; and (2) Roe was not permitted to question witnesses during the ARC hearing about her prior alleged assault in April 2017. Neither states a cognizable claim on which relief can be granted.

As to the first argument, Roe's entire case is premised on the theory that UC applied its policies discriminatorily by investigating and disciplining her, and not Doe, because she is female, and him a male. Roe claims that she was drinking that night too, yet UC did not discipline Doe for his actions. Even today though, Roe does not claim an assault, lack of consent, or incapacitation. Distilled down, Roe argues that if two students have both consumed alcohol, they both should be investigated for discipline related to a sexual encounter. Of course, that is neither UC policy nor the law. Indeed, to prevent such a perverse result, courts repeatedly have held that a "complainant" is not a comparator to the "respondent" for purposes of evaluating an equal protection or Title IX claim.

The recent Sixth Circuit case involving Miami University does not change that precedent. And, Roe's view of the law – that a university must investigate and potentially discipline a sexual assault victim if his/her assaulter had also been drinking that night, irrespective of whether the assaulter claims lack of consent – would lead to absurd results.

As to the second point, there is no guaranteed, unfettered right to cross-examination in the university disciplinary setting. In fact, Sixth Circuit courts have held the opposite time and again. Cross-examination has only been held vital in the limited "he-said-she-said" context – where the only evidence is the testimony of the victim and the accused. In such an instance, each's credibility is key, as there is nothing else to go on. That is not the case here. Everyone who saw Doe that night indicated he was incapacitated. He vomited when he returned home. All his roommates were concerned for him and asked Roe to leave so they could take care of him. Most dispositive, Roe herself realized how intoxicated Doe was. She walked him home, fed him water and Ibuprofen, and told Doe's roommates, and, separately, her own friends, that she was not leaving Doe until she was sure that he was safe. At that point, the alleged credibility of anyone else is off the table. There was no constitutional right to cross-examine Doe or the other witnesses about Roe's alleged assault in the spring of 2017.

### A. Roe's Declaratory Judgment/Equal Protection Claim fails.

Roe's first claim is for declaratory judgment on the grounds that UC violated the Equal Protection Clause by treating her differently than Doe. (Doc. 17 at PAGEID ## 595-97, ¶¶ 76-89). "The Equal Protection Clause of the Fourteenth Amendment prohibits a state from denying to any person within its jurisdiction the equal protection of the laws." *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 457 (6th Cir. 2008). It "does not forbid classifications, [but] simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Id.*, citing *Nordlinger v. Hahn*, 505 U.S. 1 (1992).

      1. <u>Roe does not sufficiently allege the existence of a similarly-situated male who was treated more favorably than her.</u>

To establish an equal protection violation, "a plaintiff must allege that the state made a distinction which burdened a fundamental right, targeted a suspect class, or intentionally treated

one differently from others similarly situated without any rational basis for the difference." *Miami Univ.*, 882 F. 3d 579 at 595, citing *Radvansky v. City of Olmsted Falls*, 395 F. 3d 291 (6th Cir. 2005). Further, in order to adequately plead a similarly-situated "comparator," a plaintiff must allege disparate treatment under "**the same set of operative facts**." *Id.* at 596, citing *Ohio State Univ.*, 239 F. Supp. 3d 1048 (emphasis added). (*See also* Doc. 17 at PAGEID # 595, ¶ 82). It is not enough for a plaintiff to generically allege a class of similarly-situated persons; instead, a plaintiff must specifically identify someone of the opposite sex who was treated better under the same circumstances. *Id.*; *accord Ohio State Univ.*, 239 F. Supp. 3d at 1067-68; *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 734 (D. Va. 2015).

Here, Roe identifies that someone as John Doe. The gist of her Complaint is that they were both drinking and intoxicated that night, and yet, UC only pursued a Title IX investigation against Roe, purportedly because she is female while Doe is male:

- "John Doe and Jane Roe were operating under the same set of operative facts when Defendants decided not to initiate the disciplinary process against John Doe. Both John Doe and Jane Roe engaged in sexual activity while intoxicated."

- "Defendants had substantial evidence to support an allegation that John Doe was intoxicated when he engaged in sexual activity with Jane Roe . . . Defendants had substantial evidence to support and allegation [*sic.*] that Jane Roe was intoxicated when she engaged in sexual activity with John Doe."

- "Although Jane Roe did not file a complaint against John Doe, Defendants knew that John Doe had engaged in non-consensual sexual acts against Jane Roe when Jane Roe was so intoxicated she was unable to provide consent as defined by UC's consent policy."

(Doc. 17 at PAGEID ## 595-96, ¶¶ 82-85).

Mindful that fact allegations are presumed true at this stage, such unsupported conclusions do not suffice. *Ohio State Univ.*, 239 F. Supp. 3d at 1064. To be sure, even by the

face of Roe's own Complaint, Roe and Doe undeniably were not similarly situated. One claimed incapacitation; the other did not. One claimed lack of consent; the other did not. One claimed not to recall parts of the night; the other did not. One reported a Title IX complaint to UC; the other did not. One said he would not have consented if he was sober; the other did not.

The Sixth Circuit's recent decision in *Miami Univ.* is instructive. *Miami Univ.* arose out of a September 2014 sexual encounter between the male plaintiff and alleged female victim. 882 F. 3d at 584. Plaintiff drank approximately six beers at a party that evening, proceeded to a bar where he drank at least two more beers and four shots, and then blacked out. *Id.* He was "sufficiently intoxicated that he [could] not clearly remember what happened for the remainder of the night." *Id.* at 586-87. Thus, "besides his own incomplete recollection," every fact introduced during the ensuing investigation and ARC hearing came from the female's own accounts. *Id.* at 585. For her part, the female student remembered everything, as she had "sobered up" by the time of the sexual encounter. *Id.* She said the encounter transitioned between consensual and non-consensual acts, culminating with her repeatedly telling the plaintiff to stop, which he eventually did. *Id.*

Miami's Student Conflict Resolution Director, Susan Vaughn, was the lead investigator on behalf of the university. *Id.* at 587. In addition to heading Miami's disciplinary investigation, Vaughn was on the ARC panel, "dominated the hearing," and had allegedly pre-determined his guilt by announcing during the hearing, "I'll bet you do this [i.e. sexually assault women] all the time." *Id.* at 601. Miami found the plaintiff responsible for violating the school's policies and suspended him for eight months, later reduced to four. *Id.* at 584.

Plaintiff sued, alleging many of the same causes of action that Roe does here. He argued Miami's failure to discipline the female for sexual misconduct, when he faced discipline, was

unequal treatment since he clearly was incapacitated during the sexual encounter and did not recall anything about it; if he was incapacitated, she should not have been kissing him, or doing anything else sexually with him. *Id*. at 596. The Sixth Circuit allowed his claims to proceed:

> [Miami] had received a report that John had engaged in non-consensual sexual acts against Jane. Vaughn also allegedly knew that Jane had engaged in non-consensual sexual acts against John, when John was so intoxicated he was unable to provide consent—as defined by Miami University's consent policy—and Jane had "kinda sobered up." The non-consensual acts Jane allegedly perpetrated—kissing John—are a type of prohibited sexual misconduct under the University's policies. Thus, Vaughn knew that Jane had potentially violated the University's sexual misconduct provisions at the same time she reviewed the allegations against John. Neither Jane nor John initiated a formal complaint themselves regarding the other's conduct, but Vaughn chose to pursue disciplinary action against John, but not Jane.
>
> These alleged facts sufficiently show at the motion-to-dismiss stage that John and Jane were similarly situated. Vaughn had credible information that both students had potentially violated the University's sexual misconduct policy. Vaughn, however, chose not to pursue disciplinary action against the female student, but only against the male student . . .

*Id*. at 596-97 (internal citations omitted).

The allegations are markedly different here. For starters, neither student accused the other of sexual misconduct in *Miami Univ*. *Id*. Instead, Miami took it upon itself to initiate an investigation, and did so even in the face of the accused male student's representations that he was so drunk he could not remember what happened that night – evidencing obvious incapacitation. Despite that evidence, Miami never investigated, or even considered investigating, the female accuser, who was sober and who admitted that at least some of the sexual activity was consensual. *See id*. ("Jane, apparently mostly sober, purportedly kissed John when he was incapacitated and unable to consent."). That was crucial – the female should not have been doing anything sexually with the male if he was so drunk that he blacked out. *Id*.

Of course, Roe, the accused here, did not profess to be blackout drunk. Roe does not claim lack of memory. Quite the contrary, although she alleges she was drinking at the party, Roe testified at the ARC hearing that "she was tipsy, not too drunk" (Doc. at 17 at PAGEID # 591, ¶ 69) and recalled all points of the evening, even texting her friend HG the next day that "We just made out." (*Id*. at PAGEID # 589, ¶ 62). Not once does Roe claim she did not consent or could not have done so.

In fact, in defense of the sexual assault complaint levied against her, Roe emphasized how caring she was of Doe: she asked Doe to leave with her, retrieved water and a first aid kit for Doe upon arriving home, and stayed at his house to "make sure he was okay." And, to further deflect any allegation of wrongdoing, and despite his roommates asking her to leave, Roe says she willingly kissed Doe in response to his purported advances, consciously and willingly locked the door upon his purported request, and after all the kissing and touching, asked him if "there was anything else [he] wanted to do." (*Id*. at PAGEID ## 583-84, ¶ 47).

Doe's state of mind and/or ability to consent are irrelevant here. The point is Roe has never argued, and does not argue now, her own lack of consent or inability to do so. She does not argue incapacitation. It was the complete opposite. (And, in fact, given that she allegedly was asking Doe if he wanted to go further and voluntarily locked the door, it otherwise would make no sense for her to claim lack of consent now. Perhaps that is why she does not.)

Moreover, also unlike *Miami Univ.*, someone **did** make a formal complaint against the other – Doe accused Roe of sexually assaulting him when he was incapacitated and thus unable to consent. Roe made no such report and alleged no such thing. By her telling, she willingly kissed Doe, and asked him if he wanted to do anything else. (*Id*.). Roe cites that allegation as a defense to Doe's Title IX charge – that she did not take advantage of him and instead carefully

sought his permission before advancing with their encounter. To Roe, that means Doe consented, or at minimum gave her the impression that he wanted to engage in sexual activity.

However, as noted above, this case is not about re-litigating whether Doe consented or could have consented to sexual activity on October 1, 2017, nor about whether Roe did anything wrong or whether this Court would have decided the matter differently. *Flaim*, 418 F. 3d at 635, n.1; *Ohio State Univ.*, 239 F. Supp. 3d at 1080. Roe's theory is that since she and Doe had both been drinking that night and were intoxicated, they were on the same playing field and should have been investigated equally for their conduct with one another. (Doc. 17 at PAGEID # 596, ¶¶ 83-85). She alleges that her drinking and intoxication should have put UC on alert that perhaps she was unable to consent to Doe's advances, and thus Doe might have violated UC policy himself.

For all the reasons discussed above, that is a textbook red herring. Drinking is not the same thing as incapacitation. Nor is merely being intoxicated. Hence, UC's Title IX Policy does not state that consent cannot be given after drinking, merely that consent cannot be given if so much alcohol is consumed that it results in "incapacitation." (*Id*. at PAGEID # 575, ¶ 28).

Simply put, UC investigated Roe because Doe said he was so drunk that he could not, and did not, consent to their sexual encounter. Not only did Roe fail to make a similar complaint to UC, she never told anyone – before, during, or after the ARC hearing – that she did not willingly participate in the sexual activity or that she was too incapacitated to do so. Thus, courts repeatedly have held that an accused-student-turned-plaintiff cannot point to the victim-complainant as a "comparator" for purposes of an equal protection or selective enforcement claim where he or she does not claim incapacitation or lack of consent:

> Courts faced with similar circumstances have found that the "complaining student" in the disciplinary proceedings is not a comparator to the accused student for purposes of a Title IX gender discrimination claim.

*Ohio State Univ.*, 239 F. Supp. 3d at 1067-68, 1082-83 (dismissing complaint where male plaintiff "did not include an example of a female student who was accused by another student of sexual misconduct under the same facts, yet either was found not responsible or was not dismissed from OSU").

The Eastern District of Michigan came to the same conclusion in a case decided last year:

> Doe advances the chimerical premise that disparate treatment is established by the fact that the complainant in this case was treated more favorably than he was, i.e., because the ultimate decision was in her favor and not his. That position, of course, disregards the self-evident and dispositive distinction between the parties: Doe was accused of sexual misconduct; the complainant was not.

*Doe v. Baum*, 227 F. Supp. 3d 784, 823 (E.D. Mich. 2017); *accord Case W. Reserve Univ.*, 2015 U.S. Dist. LEXIS 123680 at *15 ("Jane Roe, the complainant against Plaintiff in the disciplinary proceedings, is not a counterpart for purposes of a selective enforcement claim."); *Doe v. Denison Univ.*, No. 2:16-cv-143, 2017 U.S. Dist. LEXIS 53168, *11 n.6 (S.D. Ohio Mar. 30, 2017) (dismissing gender discrimination claims and affirming that a complainant/victim in student disciplinary proceedings is not similarly situated to a respondent/accused).[1]

---

[1] Courts around the country agree. *See also Pacheco v. St. Mary's Univ.*, No. 15-cv-1131, 2017 U.S. Dist. LEXIS 94510, *57-58 (W.D. Tex. June 20, 2017) (granting summary judgment on gender discrimination claims, reasoning, "there is absolutely no evidence that the complainant was similarly situated – no students made allegations or complaints of sexual misconduct against her, including [the male plaintiff] . . . While complainant was undoubtedly treated more favorably, the differences between them – most notably the lack of any allegation or complaint of misconduct – account for this disparate treatment."); *Painter v. Doe*, No. 3:15-cv-00369, 2016 U.S. Dist. LEXIS 119958, *16-17 (W.D. N.C. Sept. 6, 2016) (dismissing equal protection and Title IX claims where "the only specific person plaintiff can point to as receiving better treatment in the process is Defendant Doe. Defendant Doe is not, however, similarly situated as she was the accuser in the process not the accused."); *Armstrong v. James Madison Univ.*, No. 5:16-cv-00053, 2017 U.S. Dist. LEXIS 25014, *36 (W.D. Va. Feb. 23, 2017) (equal protection claim was "entirely frivolous because [plaintiff] was not similarly situated with Calabro and Estes. Rather, he was the subject of an investigation into alleged sexual misconduct, while they were his accusers.").

The Sixth Circuit in *Miami Univ.* did not purport to overrule these cases or to signal a change in the law. Instead, it was premised on very unique facts not present here – namely, where the student accused of sexual misconduct was so drunk that he does not recall the encounter, while the complaining student was sober and says parts of it were consensual. In that case, the conclusion that the complaining student may have violated school policy is obvious: if the accused was intoxicated to the point of blacking out, it follows that he may not have had the capacity to consent himself, such that the complainant's own conduct should at least be investigated. In stark contrast, Roe, the accused, does not allege incapacitation. Roe does not allege any lack of memory. Roe does not profess lack of consent. Roe does not claim inability to consent. Roe does not allege sexual assault.

If *Miami Univ.* means what Roe says it means – that a university must initiate an investigation and potential discipline of a victim if his/her accused had also been drinking that night – the practical implications are potentially disastrous. Imagine a sexual assault victim facing the difficult decision of reporting a classmate for assaulting her while incapacitated. Before doing so, she recalls that the person she is about to accuse was drinking the night of the assault also. By coming forward, is she going to be investigated and disciplined based on the fact that the student who assaulted her had consumed some alcohol? The chilling effect is obvious.

Equally problematic, a rule of law that requires schools to automatically investigate whether accused students are also victims by virtue of their own drinking (irrespective of whether they claim lack of consent or inability to do so) would seem to encourage would-be assaulters to drink as much as possible to reap that benefit – e.g., the knowledge that they will get to play the role of victim as well if they had been drinking. In the mind of the soon-to-be-

assaulter, this at best would only further discourage the victim from coming forward, and at worst, it could be used as a cry for leniency at the ARC hearing if the accused can maintain victim status at the same time.

These scenarios show why the Sixth Circuit did not hasten a new era of law in the *Miami Univ.* case. Its holding was limited to the context of an accused student who was so drunk he could not recall the encounter with the sober female victim. Where any student is sober or says parts of the sex were consensual, and the other says he/she does not remember any of it, the incapacitation of the latter is manifest, and the school must at least question whether the incapacitated accused was taken advantage of. That is all *Miami Univ.* stands for. And that is simply not the case here, where Roe, while drinking, does not profess a lack of memory, lack of consent, or inability to consent. Instead, she says it was all consensual and believes Doe thought it was too.[2]

Standing alone, Roe's inability to identify a male student who was treated more favorably than her on the same set of operative facts dooms her gender discrimination claims. If nothing else, Roe's allegations about UC's investigation and discipline of male students disproves her case entirely – UC does not pick and choose only members of a single sex to investigate and discipline for alleged Code of Conduct violations. (Doc. 17 at PAGEID # 596, ¶ 86(a)). That is because, at the end of the day, UC cannot control the gender of students that are making Title IX allegations, nor the gender of students being accused of Title IX violations. *E.g.*, *Pierre v. Univ. of Dayton*, No. 3:15-cv-362, 2017 U.S. Dist. LEXIS 44442, *32-33 (S.D. Ohio Mar. 27, 2017)

---

[2] Recently, Judge Dlott reconsidered and allowed to proceed an equal protection/Title IX claim where the male plaintiff utilized *Miami Univ.* to argue that he was similarly situated to his female accuser for purposes of demonstrating disparate treatment by UC because they were both drinking that night. *See Gischel v. UC*, No. 1:17-cv-475, Doc. 27 at PAGEID ##2638-39 (June 26, 2018). Respectfully, for all the reasons noted above, that is not what *Miami Univ.* stood for or even purported to stand for. Again, one student who claims assault and lack of consent cannot – both practically and as a matter of law – be similarly situated to another student who never claims lack of consent, inability to consent, or sexual assault and who, to the contrary, argues he/she believed it was consensual based on the affirmative acts of the other.

("That Pierre is a male who was accused of sexual assault, standing alone, is not sufficient to support an assertion that his gender played a role in finding him responsible for sexual assault . . . The University has no control over the gender of a student who accuses another student of sexual misconduct, nor over the gender of the student so accused.").

      2.  <u>Even assuming Doe could be a similarly-situated comparator, Roe has not sufficiently pled purposeful or intentional discrimination by UC.</u>

Adequately pleading the existence of a similarly-situated person is only the first hurdle. A plaintiff "must also allege that the different treatment [s]he received was based on 'purposeful or intentional' gender discrimination." *Miami Univ.*, 882 F. 3d at 597, citing *Smith v. City of Salem*, 378 F. 3d 566 (6th Cir. 2004). (*See also* Doc. 17 at PAGEID # 596, ¶ 86). In other words, a plaintiff must plead and eventually prove that the disparate treatment was a result of gender discrimination, and not some other reason.

Under the similar lens of a Title IX gender discrimination claim, a few bedrock principles emerge. First, real or perceived bias towards a complaining student and against the accused is not tantamount to gender discrimination or an equal protection violation. That is, bias in favor of an alleged victim is not the same thing as bias in favor of one particular sex:

> [T]he SAC alleges that "the only possible explanation" is bias against the plaintiff because of his "status as a male accused of sexual misconduct." Again, this conclusion does not *necessarily* follow from the facts alleged. Gender neutral concerns might well have easily—and more plausibly— motivated the challenged actions. Indeed, concerns like sympathy for an alleged victim of sexual assault or a desire to be tough on sexual assault are both more plausible than gender discrimination. In fact, plaintiff draws attention to his status as someone "accused of sexual misconduct," but then presents no allegation that the treatment he received was different in any way from the treatment and discipline given to a similarly-situated female accused of sexual assault.

*George Mason Univ.*, 132 F. Supp. 3d at 734; *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 607 (S.D. Ohio 2016) ("at worst UC's actions were biased in favor of alleged victims of sexual

assault and against students accused of sexual assault. However, this is not the same as gender bias because sexual assault victims can be either male or female."); *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015) ("Demonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against the alleged perpetrators, is not the equivalent of demonstrating bias against male students."); *Doe v. Cummins*, 662 Fed. Appx. 437, 452 (6th Cir. 2016) (bias "in favor of alleged victims and against those accused of misconduct does not equate to gender bias because sexual-assault victims can be both male and female").

Second, generalized allegations about external pressures schools feel to prosecute and/or prevent sexual assault are not enough. *Doe v. College of Wooster*, N.D. Ohio No. 5:16-cv-979, 2017 U.S. Dist. LEXIS 38851, *15 (Mar. 17, 2017), citing *Univ. of Cincinnati*, 173 F. Supp. 3d 586; *Cummins*, 662 Fed. Appx. at 450; *Ludlow v. Northwestern Univ.*, 125 F. Supp. 3d 783 (N.D. Ill. 2015); *Doe v. Univ. of Cincinnati*, No. 1:16cv987, 2018 U.S. Dist. LEXIS 51833, *12-15 (S.D. Ohio Mar. 28, 2018). Notably, in *Miami Univ.*, the plaintiff did not merely rely on such general allegations about outside pressures the school was facing; instead, he supported his causation allegations with specific facts: (1) every male student at Miami accused of sexual misconduct in the Fall 2013 and Spring 2014 semesters was found responsible for the violation, and (2) over ninety percent of students found responsible for sexual misconduct between 2011 and 2014 were males. 882 F. 3d at 593-94. And of course, the *Miami Univ.* plaintiff also had himself as the prime example of disparate treatment – namely, that the school did not investigate his accuser for misconduct in spite of his obvious incapacitation. *See id*. Again, however, unlike in *Miami Univ.*, the accused (Roe) and accuser (Doe) were not similarly situated here.

Here, Roe's sole allegation in support of her legal conclusion that she was intentionally discriminated against is the equally baseless statement that "UC was facing pressure to prosecute

females accused of sexual assault because it has been named a defendant in multiple lawsuit brought by men who alleged that UC discriminates against men." (Doc. 17 at PAGEID # 596, ¶ 86). That is textbook speculation, unsupported by any well-pled fact allegations. In fact, it basically mirrors the same allegations held insufficient time and again by courts with respect to "outside pressures" universities purportedly feel to discipline accused students. *See*, *e.g.*, *College of Wooster*, 2017 U.S. Dist. LEXIS 38851 at *15; *Univ. of Cincinnati*, 173 F. Supp. 3d at 601-02; *Cummins*, 662 Fed. Appx. at 450.

In the end, even if Roe had sufficiently identified a similarly-situated male who UC treated more favorably than her (which she does not and which, in fact, is rebutted by her own allegations that UC routinely investigates and disciplines male students who are accused of sexual assault too), her equal protection claim still fails because there are no fact allegations which support the inference that UC purposefully or intentionally discriminated against Roe because she is female rather than male. *See Miami Univ.*, 882 F. 3d at 597; *Baum*, 227 F. Supp. 3d at 817-818 ("the plaintiff has offered nothing more than an administrative decision by school officials with which he disagreed, and unelaborated allegations that the decision must have been due to 'gender bias,' essentially because he is male, the complainant is female, and the decision as adverse to him"). In reality, UC did not investigate and discipline Roe based on the fact that she is female. UC investigated and disciplined her because Doe accused her of sexual assault, and, after a full investigation and hearing in which Roe participated, UC found those allegations to have merit. Gender had nothing to do with it.

**B. Roe's Equal Protection/42 U.S.C. § 1983 Claim fails.**

    i.   <u>Count II is premised on the same insufficient allegations as Count I.</u>

In Count II, Roe seeks an injunction "prohibiting the imposition of, or reporting of, any disciplinary actions under the UC Code of Student Conduct against the Plaintiff." (Doc. 17 at PAGEID ## 597-98, ¶¶ 91-98). This claim goes hand in hand with the first; Roe just repeats and re-alleges an equal protection claim under the Fourteenth Amendment. (*Id.* at ¶ 93). Therefore, for the same reasons that Roe failed to state a plausible declaratory judgment claim on equal protection grounds, Count II should also be dismissed.

    ii.   <u>The Individual UC Defendants are immune from suit in their personal capacities.</u>

If Count I survives, and to the extent Roe seeks damages from the individual UC defendants in their personal capacities (*id.* at PAGEID # 598, ¶ 95), Defendants Phillips, Wells, Guardia, and Mitchell are immune from such claims. Under the well-established doctrine of qualified immunity, a public official is shielded from suit under § 1983 "if his conduct does not violate a clearly established statutory or constitutional right of which a reasonable official would have known." *Univ. of Cincinnati*, 173 F. Supp. 3d at 604-605, citing *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727 (1982). The "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.*, citing *Anderson v. Creighton*, 483 U.S. 635 (1987). In "determining whether a constitutional right is clearly established, the court must find binding decisions from the U.S. Supreme Court, the Sixth Circuit Court of Appeals, or, finally, decisions of other circuit courts." *Id.* at 605.

Against the ever-evolving law in this area and the reams of Sixth Circuit cases establishing that a student disciplinary proceeding is not, and should not be, akin to a criminal trial, courts consistently find individual defendants immune because the "contours" of a student's

due process and/or equal protection rights are not "clearly established." If anything, the current landscape points in the opposite direction – i.e., less rights, not more. *Univ. of Cincinnati,* 173 F.3d at 605-606 ("it has not been clearly established that Plaintiffs were entitled to all of the procedural protections they claim were missing from their disciplinary hearings. In fact, the case law generally points the other way – it was clearly established that Plaintiffs <u>were not</u> entitled to the individual protections they claim.").

In this particular setting, until *Miami Univ.* added a new wrinkle on the fact pattern where an accused student arguably might have a claim if his accuser is not investigated also, the law was unanimous that a student alleging sexual assault could not be a comparator to his or her accused for purposes of an equal protection claim. (*See supra*, pp. 13-14). Thus, it can hardly be said that the individual UC defendants here *knowingly* violated any *clearly established* rights.

*Miami Univ.* offers another instructive comparison. There, the Sixth Circuit affirmed qualified immunity for all but one of the individual defendants. 882 F. 3d at 604. The lone claim that survived was against the school administrator who sat on the ARC panel, "dominated the hearing," and had allegedly pre-determined the student's guilt by announcing during the hearing, "I'll bet you do this [i.e. sexually assault women] all the time." *Id.* at 601. The bias and gender stereotyping there was obvious. Of course, no such allegations exist here. Therefore, at minimum, the claims against the individual UC defendants in their personal capacities should be dismissed.

### C. Roe's Due Process Claim Fails

Next, Roe alleges a due process claim. (Doc. 17 at PAGEID ## 598-600, ¶¶ 100-113). Recognizing the substantial deference the law gives to school administrators, federal courts have required that universities provide the following procedural safeguards before suspending or

expelling a student: (1) notice of the charges, (2) an explanation of the evidence that authorities have against the student, (3) an opportunity for the student to tell his or her side, and (4) a pre-expulsion hearing before an impartial trier of fact. *Ashiegbu v. Williams*, 6th Cir. No. 97-3173, 1997 U.S. App. LEXIS 32345, *3 (Nov. 12, 1997), citing *Goss v. Lopez*, 419 U.S. 565 (1975) and *Newsome v. Batavia Loc. School Dist.*, 842 F.2d 920 (6th Cir. 1988). Once a student receives these basic safeguards, "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Ohio State Univ.*, 239 F. Supp. 3d at 1080.

Roe received due process. She had notice of the charges, was kept up to date on the investigation, participated in an ARC hearing, was able to call witnesses, was able to cross examine (via written questions) every witness who testified at the hearing, and was permitted to appeal. (Doc. 17 at PAGEID ## 584, 590, 594, ¶¶ 49, 51, 67, 71). No more process was or is required. *See Cummins*, 662 Fed. Appx. at 446-450.

The gist of Roe's complaint here is that she was not allowed to question Doe and another witness about her alleged assault in April 2017. (*Id.* at ¶¶ 107-108). Notably, this is not the typical due process claim where no form of cross-examination has been permitted. Instead, Roe was granted that right here, albeit in the form of written questions. (*Id.*). But, she claims her inability to ask questions of Doe and "CB" about the time CB allegedly assaulted her was a due process violation because it could have "revealed possible biases." (*Id.*).

Mindful that school disciplinary proceedings are not, and should not be, criminal trials, the amount of process that is due to a student accused of sexual misconduct is guided by the well-established *Mathews* inquiry. Under *Mathews v. Eldridge*, 44 U.S. 319 (1976), courts balance three factors: (1) the nature of the private interest affected by the deprivation; (2) the risk of an erroneous deprivation in the current procedures used, and the probable value, if any, of

additional or alternative procedures; and (3) the governmental interest involved, including the burden that additional procedures would entail. *See also Doe v. Cummins*, 662 Fed. Appx. 437, 446 (6th Cir. 2016).

And here, it has long been the rule that students do not enjoy an absolute right to unfettered cross-examination in the university disciplinary context. *See id.* at 448; *Pierre*, 2017 U.S. Dist. LEXIS 44442 at *25 ("It is not a due process violation to prohibit students from directly cross-examining each other, witnesses, or University employees."); *Doe v. Univ. of Cincinnati*, 872 F. 3d 393, 400 (6th Cir. 2017) ("The right to cross-examine witnesses generally has not been considered an essential requirement of due process in school disciplinary proceedings.").

The Sixth Circuit has fashioned a narrow exception where cross-examination might be required: where credibility is at issue. *Id.*, citing *Flaim*, 418 F.3d at 641. In other words, where the ARC panel is left "with a choice between believing an accuser and an accused," then cross-examination might be warranted. *Univ. of Cincinnati*, 872 F. 3d at 402. Setting aside that Roe was permitted some cross-examination of every witness, that exception does not apply here. Neither Doe nor CB's credibility was at issue. The ARC Panel was not left to decide whether to believe Roe or Doe. Instead, Roe's own testimony and corresponding communications with her friends that evening proved that Roe herself believed Doe was in bad shape:

- Roe asked Doe to leave the party with her and retrieved a first aid kid, water, and ibuprofen for him when they arrived at his house. (Doc. 17 at PAGEID # 583, ¶ 47(c)).

- Roe "did not feel comfortable leaving John Doe and told him that she would not leave until he drank some water." (*Id.*).

- Roe texted her friend HG at 1:17 a.m., stating "she was not leaving John Doe until he's okay." (*Id.* at PAGEID # 588, ¶ 58(d)).

- Upon being asked to leave, Roe told Doe's roommate, CP (*not* CB), "I promise you, nothing is going to happen. I'm just gonna give him water, look him over, that's it." (*Id*. at PAGEID # 586, ¶ 56(c)).

Of course, Roe's admitted concern for Doe was shared by all his roommates, who all asked her to leave numerous times, to the point that Roe felt they were being "mean," and who observed him vomiting and described him as extremely intoxicated. (*Id*. at PAGEID # 588, ¶ 58(d); PAGEID ## 586-88, ¶ 56(c) ("CP" statement); ¶ 57(c) ("TB" statement); ¶ 59(b) ("EP" statement)). As a matter of policy, UC cannot condone one student's sexual conduct with another where that other person is vomiting; is in such bad shape that the first student is force-feeding him water and ibuprofen; refuses to leave despite the other's roommates asking her to leave because they are concerned for him and stays put under the guise of making sure he is okay; and all after admittedly telling friends and others that she did not feel comfortable leaving him alone. This is the textbook situation in which consent is lacking under UC's Title IX Grievance Procedure and Sexual Misconduct Policy.

More to the point for cross-examination purposes, this was not simply a "he-said-she-said" encounter. Roe's own testimony and contemporaneous statements evidenced her beliefs about Doe's waning mental and cognitive state. Doe's roommates pleaded with her to leave because they were worried about him. She refused and told a friend she was not leaving Doe until he was "okay." Whether Roe could have questioned CB about the April 2017 incident where he allegedly assaulted her does not change any of that. CB was not one of the roommates who pleaded with her to leave or who witnessed Doe vomiting. And CB obviously did not have anything to do with Roe's own professed concern for Doe.

Likewise, asking Doe any questions about Roe's prior assault would have done nothing to change the evidence before the panel. It was the observations and statements of others –

namely, of EP, TB, CP, HG, and Roe herself – that evidenced his incapacitation. Roe's baseless theory that Doe "harbored a grudge" or "was motivated to bring a complaint against Jane Roe in retaliation for the April 2017 Complaint" does not negate any of those witness statements. (*See id*. at PAGEID # 600, ¶ 107).[3]

Thus, this case was not one of simply believing accuser or accused. No purported "grudge" by an ancillary witness could have undone the corroborating testimony about Doe's state, most notably by Roe herself, nor could asking Doe about the April 2017 incident have guided the ARC Panel in any way on the issue at hand. *Compare Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 605 (D. Mass. 2016) (requiring cross examination, reasoning, "Here, there were essentially no third-party witnesses to any of the events in question, and there does not appear to have been any contemporary corroborating evidence. The entire investigation thus turned on the credibility of the accuser and the accused. Under the circumstances, the lack of an opportunity for cross-examination may have had a very substantial effect on the fairness of the proceeding.") *and Univ. of Cincinnati*, 872 F.3d 393 at 402 (requiring cross-examination because "the lack of corroborative evidence to support or refute Roe's allegations . . . left the ARC panel with a choice between believing an accuser and an accused") *with Doe v. Loh*, No. PX-16-3314, 2018 U.S. Dist. LEXIS 53619,*22-23 (D. Md. Mar. 29, 2018) (collecting cases) (accused student read the credibility exception "too narrowly," and no unlimited cross-examination was required where the university fairly balanced the "interests in the integrity of its disciplinary proceedings against Doe's limitation on cross-examining Roe").

---

[3] That is a wildly misleading allegation too, since Doe was by all accounts Roe's advocate on the night in question in April 2017. Indeed, quite the opposite of taking sides, Doe extricated Roe from the situation and generously walked her out of that party because she told him she was uncomfortable. Of course, Roe deliberately omits all that. For the sake of a ruling on the pleadings, however, Defendants concede the assumed truth of the allegations as pled.

Because Roe was allowed some cross-examination, and because the ARC Panel was not left to simply believe him or her, there was no due process violation for not permitting Roe to question Doe and CB about the April 2017 incident. Otherwise, if schools are forced to entertain unfettered cross-examination, the line between university disciplinary proceeding and criminal trial becomes increasingly blurred. *See Loh*, 2018 U.S. Dist. LEXIS 535619 at *22 ("It is well settled that the accused is not entitled to 'trial-like' rights of confrontation or cross-examination at disciplinary proceedings."); *Flaim*, 418 F. 3d at 640 ("A university is not a court of law, and it is neither practical nor desirable it be one."); *Cummins*, 662 Fed. Appx. at 446 ("a full-scale adversarial proceeding is not required"); *United States v. Miami Univ.*, 91 F. Supp. 2d 1132, 1158 (S.D. Ohio 2000) ("disciplinary proceedings are not criminal trials; rather, they are meant to safeguard a university's primary purpose, which is to educate its students.").

**D. Roe's Due Process/42 U.S.C. § 1983 Claim fails.**

### i. Count IV is premised on the same insufficient allegations as Count III.

As she did above with the equal protection claims, Roe has brought a companion due process claim under 42 U.S.C. § 1983, where she seeks injunctive relief against the individual UC defendants in their official capacities and damages in their personal capacities. (Doc. 17 at PAGEID # 600-01, ¶¶ 115-121). For the same reasons that Count III fails, Count IV must also be dismissed. Namely, Roe has not stated a due process claim on which relief can be granted; there was no right to unlimited cross-examination where the ARC Panel's determination did not come down to who was more credible between Roe and Doe. Therefore, all of Count IV fails.

### ii. The Individual UC Defendants are immune from suit in their personal capacities.

Even if the Court finds Roe has adequately stated a due process claim on which relief can be granted, the individual UC defendants still must be dismissed in their personal capacities

because they are immune. *Univ. of Cincinnati*, 173 F. Supp. 3d at 604-05. Again, the contours of a student's due process rights are anything but "clearly established," and courts have held time and again that individual university administrators should not be put in the middle of this debate. *Id.* at 605-06 ("it has not been clearly established that Plaintiffs were entitled to all of the procedural protections they claim were missing from their disciplinary hearings. In fact, the case law generally points the other way – it was clearly established that Plaintiffs <u>were not</u> entitled to the individual protections they claim."); *Marshall v. Ohio Univ.*, No. 2:15-cv-775, 2015 U.S. Dist. LEXIS 155291, *40-42 (S.D. Ohio Nov. 17, 2015) ("Although some courts have concluded that university students have such [due process] rights, the existence and contours of those rights appear to remain an issue of judicial debate. If judges thus disagree on the constitutional question, it is unfair to subject government officials to money damages for picking the losing side of the controversy.").

Indeed, even in the few Sixth Circuit cases which allowed the credibility exception to save a plaintiff's due process claim based on a lack of cross-examination, the Court has dismissed the damages claims against the individual defendants in their personal capacities:

> However, as to the claims against the Individual Defendants in their personal capacities, Gischel cannot overcome the asserted defense of qualified immunity. The law regarding what process is due in the student disciplinary context is evolving. The Sixth Circuit has not clearly defined the contours of the circumscribed cross-examination to be afforded to an accused during a university disciplinary proceeding. Gischel has not identified Supreme Court or Sixth Circuit precedent holding that Gischel had an absolute right to have all of his questions posed directly to Schoewe at the hearing.

*E.g.*, *Gischel v. Univ. of Cincinnati*, No. 1:17-cv-475, 2018 U.S. Dist. LEXIS 1808, *38 (S.D. Ohio Feb. 5, 2018)[4]; *Doe v. Ohio State Univ.*, No. 2:15-cv-2830, 2018 U.S. Dist. LEXIS 68364,

---

[4] Judge Dlott reconsidered and reversed on her qualified immunity analysis with respect to the equal protection claims, but not the procedural due process/cross-examination claims.

*31-32 (S.D. Ohio Apr. 24, 2018) (granting summary judgment to all individual defendants except one on qualified immunity grounds, even where due process/cross-examination claim was permitted to proceed against OSU; the one individual defendant who remained in the case "knew or should have known that Jane Roe lied or misled the disciplinary board," but didn't speak up).

Therefore, even if Roe's declaratory judgment claim proceeds, the individual UC defendants – Phillips, Wells, Guardia, and Mitchell – should be dismissed in their personal capacities.

### E. Roe's Selective Enforcement Claim fails.

Roe's final claim is for selective enforcement under Title IX. (Doc. 17 at PAGEID ## 601-603, ¶¶ 123-135). In broad strokes, Title IX prohibits educational institutions receiving federal funds from discriminating on the basis of gender. *Cummins*, 662 Fed. Appx. at 451, citing 20 U.S.C. § 1681(a)(1). In the university disciplinary context, Title IX prevents a school from disciplining a student because of his or her gender. *Id*.

On that score, Title IX claims overlap significantly with equal protection claims. *E.g.*, *George Mason Univ.*, 132 F. Supp. 3d at 734 (plaintiff's equal protection claim failed because it was premised on the same insufficient allegations as his Title IX claims). Indeed, Roe's Title IX allegations parrot the ones she made in support of her equal protection claim: UC violated Title IX by not investigating or disciplining a similarly situated person, Doe, for engaging in sexual activity with Roe, and UC's punishment of Roe was solely to aid in the defense of civil lawsuits brought by male students. (Doc. 17 at PAGEID # 602, ¶ 129).

And so, for the same reasons that Counts I and II fail, Count III likewise must be dismissed. Roe does not sufficiently allege a similarly-situated male student who UC treated more favorably than her (again, that is flatly contradicted by her contemporaneous allegations

about UC's routine investigation and discipline of male students too). Doe is not similarly situated because, unlike Roe, he reported a sexual assault, said he was incapacitated, said he does not remember what happened because he was so drunk, said he did not consent, and said he would not have consented if he was sober. A student accusing another of sexual assault and claiming lack of consent cannot be similarly situated to the person being accused who does not claim assault or lack of consent. *See Ohio State Univ.*, 239 F. Supp. 3d at 1067-68, 1082-83; *Baum*, 227 F. Supp.3d at 823; *Case W. Reserve Univ.*, 2015 U.S. Dist. LEXIS 123680 at *15.

And, even assuming Roe had adequately pled a similarly-situated male student who received more favorable treatment, there still is no plausible gender discrimination because Roe does not sufficiently plead that UC intentionally and purposefully disciplined her because she is female rather than male. *Miami Univ.*, 882 F. 3d at 597. Instead, UC investigated her because another student complained about being sexually assaulted by her. And the allegation that UC disciplined her solely for use in other civil suits brought by male students is rank conjecture and not enough to overcome a motion to dismiss. *See Univ. of Cincinnati*, 173 F. Supp. 3d at 586; *Cummins*, 662 Fed. Appx. at 450; *College of Wooster*, 2017 U.S. Dist. LEXIS 38851 at *15.

Therefore, Roe has not plausibly stated a claim for gender discrimination. Her Title IX selective enforcement claim must be dismissed.

## IV. CONCLUSION

Jane Roe's Amended Complaint fails to state a claim on which relief can be granted. For the foregoing reasons, this Court should dismiss under Civ.R. 12(b)(6).

Respectfully submitted,

/s/ Eric K. Combs
Eric K. Combs (0067201)
Andrew B. Cassady (0092413)
DINSMORE & SHOHL LLP
255 E. Fifth Street, Suite 1900
Cincinnati, Ohio 45202
Phone:  (513) 977-8200
Fax:      (513) 977-8141
eric.combs@dinsmore.com
andrew.cassady@dinsmore.com

***Attorneys for Defendants***

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of July, 2018, the foregoing document was electronically filed with the Clerk of Courts for the U.S.D.C. for the Southern District of Ohio via the Court's CM/ECF system, which system will notify all parties of the filing of same. The parties may access this filing through the Court's system.

/s/ Eric K. Combs
Eric K. Combs (0067201)