# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| JANE ROE, | : | Case No. 1:18-cv-312 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| vs. | : | |
| | : | |
| UNIVERSITY OF CINCINNATI, *et al.*, | : | |
| | : | |
| Defendants. | : | |

# ORDER DENYING PLAINTIFF'S MOTION
# FOR PRELIMINARY INJUNCTION

This civil action is before the Court on Plaintiff's motion for a preliminary injunction (Doc. 2) and the parties' responsive memoranda.  (Docs. 18, 21, 23).

# I.    BACKGROUND

This case arises out of an investigation by Defendant University of Cincinnati ("UC" or "Defendant") into the alleged violation of UC's Student Code of Conduct by Plaintiff Jane Roe for engaging in sexual activity with a student, John Doe, who was incapacitated, and therefore could not consent.  (Doc. 17 at ¶ 49).[1]  Plaintiff claims that UC's investigation into the alleged sexual assault violated the Equal Protection Clause and the Due Process Clause of the United States Constitution.  Plaintiff's motion for a preliminary injunction requests that the Court prohibit UC from imposing any disciplinary sanctions against Ms. Roe.  (Doc. 2 at 16).

---

[1] The Court previously granted Jane Roe's motion to proceed anonymously under a pseudonym. (Doc. 3)

This motion presents the Court with two novel issues:

(1) Whether – to protect students' equal protection rights – a school is obligated to investigate an alleged sexual assault victim for potentially violating school policies when the alleged sexual assault perpetrator claims that the sexual activity was consensual, but also mentions that he/she had consumed alcohol before the alleged sexual assault.

(2) Whether a student's procedural due process rights are violated if he/she is not allowed unfettered cross-examination during a school discipline hearing.

Before analyzing these issues, the Court must examine the factual allegations related to the alleged sexual assault and UC's investigation into that alleged assault.

## A. Background Facts

### 1. Alleged sexual assault

This dispute revolves around a sexual encounter between two UC students, Plaintiff Jane Roe ("Ms. Roe") and John Doe ("Mr. Doe"), both ROTC cadets at UC, on September 30-October 1, 2017. (Doc. 17 at ¶ 47). Both Ms. Roe and Mr. Doe attended an off-campus party where they both consumed alcohol. (*Id.*). Mr. Doe became intoxicated. Ms. Roe walked Mr. Doe home when he told her he was drunk and wanted to go home. (Doc. 2 at 5). Upon arriving at Mr. Doe's house, Ms. Roe said she "did not feel comfortable leaving Mr. Doe and told him that she would not leave until he drank some water." (Doc. 17 at ¶ 47).

Mr. Doe's roommates were also concerned about Mr. Doe's level of intoxication. Mr. Doe's roommates told Ms. Roe to leave several times, but she refused because she said she was dizzy. (*Id.*). Ms. Roe allegedly told Mr. Doe's roommates "I promise you, nothing is going to happen. I'm just gonna give him his water, look him over, that's it."

(*Id.* at ¶ 56).  Mr. Doe's roommates witnessed him vomiting.  (*Id.*).  Ms. Roe sent her friend a text that night that she was not going to leave Mr. Doe until he was okay.  (*Id.* at ¶ 58).

Even though Ms. Roe had expressed concern over Mr. Doe's inebriation, and had assured Mr. Doe's roommates that nothing was going to happen, she allegedly locked the door, took off her clothes, made out with Mr. Doe, was digitally penetrated by Mr. Doe, and asked "if there was anything else [Mr. Doe] wanted to do?" (*Id.* at ¶¶ 47, 54).  Ms. Roe alleges that Mr. Doe responded that they should go to sleep.  (*Id.*).  The next morning, Mr. Doe woke up with Ms. Roe still in his room and blood on his hands and sheets.  Mr. Doe's roommate testified that Mr. Doe was upset and told his roommate to get Ms. Roe to leave.  (Doc. 16-1 at PAGEID # 469).  Mr. Doe reported the incident to military personnel that same day, October 1, 2017.  (*Id.* at PAGE ID # 471).

## 2.  UC investigation

On October 2, 2017, Mr. Doe filed a complaint with the UC Title IX Office alleging that he had been sexually assaulted by Ms. Roe.  (Id. at ¶ 48).  That same day, UC notified Ms. Roe of the allegations and the investigation into her conduct.  (*Id.* at ¶ 49).

Ms. Roe was accused of violating the UC Title IX Grievance Procedure for Students and Third Parties (the "Policy"), which prohibits sexual/gender-based violence. The Policy defines sexual/gender-based violence as "physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent due to the person's use of drugs or alcohol."  (Doc. 1 at PAGEID # 174).  The Policy defines

3

consent in relevant part:

> Consent is informed, freely given, mutual, and can be withdrawn at any time. A person cannot give consent if he or she is mentally or physically incapacitated or impaired such that the person cannot understand the fact, nature or extent of the sexual situation; this includes impairment or incapacitation due to age, alcohol or drug consumption, or being asleep or unconscious.

(*Id.* at PAGEID # 172).

UC's investigation into Ms. Roe included reviewing statements from Ms. Roe, Mr. Doe, and seven witnesses. (Doc. 16-1 at PAGEID # 460). Both Mr. Doe and Ms. Roe were invited to submit materials and the names of potential witnesses. (Doc. 17 at ¶ 51). UC completed its fact-finding report on November 27, 2017. (Doc. 16-1 at PAGEID # 458–77).

In Mr. Doe's initial statement to UC, he recalled walking home with Ms. Roe and vomiting when they got to his house. (Doc. 17 at ¶ 54). Mr. Doe said he fell asleep in his bed and when he woke up that night, Ms. Roe had taken off her clothes and locked the door. (*Id.*). Mr. Doe stated that Ms. Roe started kissing and touching him and told him to have sex with her. Mr. Doe replied no. (*Id.*). The next morning Mr. Doe woke up with blood on his hands and sheets. (*Id.*). He had no memory of digitally penetrating Ms. Roe, but inferred he did because of the blood. (*Id.*). Mr. Doe told UC that he would not have engaged in sexual activity with Ms. Roe if he had been sober and he did not consent to whatever had happened. (*Id.*).

Ms. Roe, on the other hand, told UC that the sexual activity was consensual. (Doc. 16-3 at PAGEID # 560). Ms. Roe made statements indicating that she was aware

4

Mr. Doe was intoxicated. Ms. Roe admitted that at the party before the incident, she told

another female student not to go home with Mr. Doe because he was too drunk. (Doc.

16-1 at PAGEID # 388). Ms. Roe also stated that Mr. Doe had told her he wanted to go

home because he was drunk. (*Id.*) Ms. Roe testified that Mr. Doe instigated the sexual

activity and asked Ms. Roe to lock the door to his room. (Doc. 16-3 at PAGEID # 530).

Ms. Roe said she believed "that [Mr. Doe] was an active and willing participant in the

contact between us." (*Id.*). Two witnesses for Ms. Roe mentioned that Ms. Roe had told

them that she was intoxicated. (Doc. 16-1 at PAGEID # 474). Mr. Doe's roommate

stated in his report that Ms. Roe did not seem inebriated and had told him she was fine.

(*Id.* at PAGEID # 357). Ms. Roe described herself as "tipsy, not too drunk." (Doc. 16-3

at PAGEID # 531).

Taking Mr. Doe's and Ms. Roe's statements into account, the Title IX investigator

assigned to the matter found that:

> [I]t is not disputed that the sexual conduct occurred. Respondent stated that
> she and [Mr. Doe] kissed and that [Mr. Doe] digitally penetrated her. As
> such, the analysis moves to whether the sexual activity was consensual or
> nonconsensual.

(Doc. 17 at ¶ 63).

UC held an in-person hearing on January 26, 2018 to investigate the incident. Ms.

Roe requested that three individuals who gave statements for Mr. Doe be questioned.

Mr. Doe requested that one witness who provided a statement for Ms. Roe be questioned.

(Doc. 16-1 at PAGEID # 499). UC only permitted witnesses to be questioned on the

incident between Ms. Roe and Doe. Ms. Roe wanted the witnesses to be questioned

5

regarding an April 2017 complaint that Ms. Roe had filed with UC (the "April 2017 Complaint") to show potential bias.[2] (Doc. 18-1 at ¶ 7; Doc. 18-2 at ¶¶ 5, 6). Ms. Roe further alleges that she was told she could not mention the April 2017 Complaint. (Doc. 18-2 at ¶ 5). Witnesses were also cut-off when they began to discuss the April 2017 Complaint during the January 26, 2018 hearing. (Doc. 16-3 at PAGEID # 556).

UC ultimately found Ms. Roe responsible for violating the UC Policy. (Doc. 16-1 at PAGEID # 499). UC found that Ms. Roe should have known that Mr. Doe was incapacitated and could not provide consent. (*Id.*). UC also found inconsistencies in Ms. Roe's statement as "she indicated that [Mr. Doe] did not seem incapacitated, but in the text conversations [with her friend], she said she was worried about him and would not leave [because] he was not ok." (*Id.*). UC suspended Ms. Roe until Mr. Doe graduated or stopped attending UC to prevent fear, concern, or emotional trauma to Mr. Doe. (*Id.* at PAGEID # 349, 500).

---

[2] In April 2017, Ms. Roe filed a complaint with UC alleging that she was sexually assaulted by a male student, "CB," who was an ROTC member with Ms. Roe and Mr. Doe. (Doc. 17 at ¶¶ 40–44). UC held an investigation and disciplinary hearing related to that incident. Mr. Doe testified on CB's behalf. UC found CB not responsible for the allegations. (*Id.*). However, the incident was reported to ROTC personnel and CB was ultimately dismissed from the ROTC program due to an unrelated incident. Ms. Roe alleges that other ROTC members, including Mr. Doe, blamed her for CB's ROTC dismissal. (Doc. 18 at 3–4).

Essentially, Ms. Roe argues that Mr. Doe and CB "harbored a grudge against her as a result" of the April 2017 Complaint, and, therefore, falsely accused her of sexual assault. (Doc. 18-1 at ¶ 4; Doc. 18-2 at ¶ 4). Ms. Roe contends that questions related to the April 2017 Complaint would have evinced bias on the part of Mr. Doe and CB. (*Id.*).

## II.  STANDARD OF REVIEW

Ms. Row bears the heavy burden of demonstrating her entitlement to a preliminary injunction.  An "injunction is an **extraordinary remedy** which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Gov't,* 305 F.3d 566, 573 (6th Cir. 2002) (emphasis added).  Thus, the party seeking the injunction must establish its case by clear and convincing evidence.  *Marshall v. Ohio University*, No. 2:15-cv-775, 2015 WL 1179955, at *4 (S.D. Ohio Mar. 13, 2015) (citing *Honeywell, Inc. v. Brewer-Garrett Co.*, 145 F.3d 1331 (6th Cir. 1998)).

In determining whether to grant injunctive relief, this Court must weigh four factors: (1) whether the moving party has shown a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction.  *Id.*  These four considerations are factors to be balanced, not prerequisites that must be met. *McPherson v. Michigan High Sch. Athletic Ass'n, Inc*., 119 F.3d 453, 459 (6th Cir. 1997). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal."  *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th Cir. 2000).

## III. ANALYSIS

### A. Likelihood of Success on the Merits

Ms. Roe brings her claim under 42 U.S.C. § 1983, arguing that Defendants are violating the Equal Protection Clause and Due Process Clause of the United States Constitution.[3]

Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

To show a likelihood of success on a § 1983 claim, a plaintiff must establish two elements: "1) the deprivation of a right secured by the Constitution or laws of the United States and 2) the deprivation was caused by a person acting under color of state law." *Ellison v. Garbarino*, 48 F.3d 192, 194 (6th Cir. 1995). There is no dispute that UC, a public university, was acting under color of state law, and, therefore, the first issue before the Court is whether Ms. Roe has shown by clear and convincing evidence that she was deprived of a constitutional right.

---

[3] The Amended Complaint also alleges a Title IX claim premised on the theory of selective enforcement. (Doc. 17 at ¶¶ 122–135). A Title IX selective enforcement claim is similar to an equal protection claim in that the "plaintiff must show that a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender." *Doe v. Cummins*, 662 Fed.Appx. 437, 452 (6th Cir. 2016). Ms. Roe did not mention her selective enforcement claim in the preliminary injunction briefing until her reply brief (Doc. 23 at 2–8), and, therefore, the Court will not consider the likelihood of success on Ms. Roe's Title IX statutory claims.

### 1. Equal Protection Claim

To establish an equal protection violation, a plaintiff must demonstrate that the state made a distinction which "burdened a fundamental right, targeted a suspect class, or intentionally treated one differently from others similarly situated without any rational basis for the difference." *Doe v. Miami Univ.*, 882 F.3d 579, 596 (6th Cir. 2018) (citing *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005)). "The threshold element of an equal protection claim is disparate treatment." *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2000).

In order to show a likelihood of success on her equal protection claim, Ms. Roe must establish two elements: (1) she and Mr. Doe were similarly situated and (2) she was treated differently due to gender discrimination.

First, to show that she was similarly situated to Mr. Doe, Ms. Roe must demonstrate that Defendants were operating under "the same set of operative facts" when UC decided not to initiate the disciplinary process against Mr. Doe. *Miami Univ.*, 882 F.3d at 596 (quoting *Doe v. Ohio State Univ.*, 239 F.Supp.3d 1048, 1083 (S.D. Ohio 2017)). In order for individuals to be similarly situated there must be "relevant similarity," but there need to be "exact correlation." *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000).

Second, Ms. Roe must demonstrate that the different treatment she received was based on "purposeful or intentional" gender discrimination. *Smith v. City of Salem*, 378

F.3d 566, 577 (6th Cir. 2004).[4]  "Such allegations might include, *inter alia*, statements by

members of the disciplinary tribunal, statements by pertinent university officials, or

patterns of decision-making that also tend to show the influence of gender."  *Cummins*,

662 Fed.Appx. at 452 (citing *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994)).

### a.  Ms. Roe does <u>not</u> demonstrate that UC treated her differently under the same set of operative facts as John Doe

Ms. Roe argues that UC's failure to investigate Mr. Doe for his having engaging in

sexual conduct which was potentially in violation of UC's Policy, when she was

investigated for such, was unequal treatment.

---

[4] Ms. Roe claims she does not need to prove purposeful or intentional gender discrimination because she is proceeding under a "class of one" theory.  (Doc. 2 at 9; Doc. 23 at 6).

To establish a claim under the class of one theory, a plaintiff must "(1) show that [s]he was intentionally treated differently from others similarly situated, with no rational basis for the difference in treatment, and (2) establish facts sufficient to overcome the presumption of rationality that applies to government classifications."  *Cwik v. Dillon*, No. C-1-09-669, 2010 WL 5691404, at *7 (S.D. Ohio Sept. 20, 2010). The Sixth Circuit has held that such a plaintiff must demonstrate the lack of a rational basis for the disparate treatment in one of two ways: (1) "negativing every conceivable basis which might support the government action" or (2) "demonstrating that the challenged government action was motivated by animus or ill-will." *Warren v. City of Athens*, 411 F.3d 697, 710–11 (6th Cir. 2005).

No court within the Sixth Circuit has applied the class of one theory in the university discipline context.  Moreover, due to the substantial deference university administrators are given in disciplinary proceedings, courts have found the class of one theory to be inapplicable in the context of public education.  *See Kerr v. Marshall Univ. Bd. of Governors*, No. 2:14-cv-12333, 2015 WL 1405537, at *23 (S.D. W.Va. Mar. 26, 2015) (citing several cases finding that the "class of one equal protection theory is inapplicable in the context of public education" because of "the inherently discretionary decisionmaking that occurs" in the university setting); *Salau v. Denton*, 139 F. Supp. 3d 988, 1006-07 (W.D. Mo. 2015) ("Because of the discretionary nature of the student disciplinary proceedings, this action is not suited for a class of one theory.").

Accordingly, the Court finds that the class of one theory is inappropriate in this case.  Moreover, even if the class of one theory were applicable, Ms. Roe has failed to negate every conceivable basis which might support UC's investigation and has not shown animus or ill-will by UC.

Ms. Roe relies on the Sixth Circuit's recent decision in *Miami University* to contend that granting a preliminary injunction is appropriate based on her equal protection claim. In that decision, the Sixth Circuit clarified that an accuser can be the similarly situated individual to whom the accused plaintiff is compared. *Compare Miami Univ.*, 882 F.3d at 596 ("These alleged facts sufficiently show at the motion-to-dismiss stage that [accused] and [accuser] were similarly situated.") *with Gischel v. Univ. of Cincinnati*, 302 F.Supp.3d 961, 972 (S.D. Ohio 2018) ("the accuser cannot be the similarly-situated individual to whom the accused student plaintiff is compared."). With this established, the Sixth Circuit found that an accuser and accused are similarly situated when university officials "had credible information that both students had potentially violated the University's sexual misconduct policy" but choose "not to pursue disciplinary action against" one of the students. *Miami Univ.*, 882 F.3d at 596.

Ms. Roe argues that the Sixth Circuit's finding in *Miami University* is directly applicable here: Ms. Roe alleges she was treated differently than Mr. Doe because, during UC's investigation into the alleged sexual assault, UC discovered that Ms. Roe had been drinking. Ms. Roe contends that once UC was aware that she had been drinking, UC was obligated to begin an investigation into Mr. Doe's actions to determine if he too had violated UC's Policy. By not investigating Mr. Doe, once UC was aware of Ms. Roe's drinking, Ms. Roe alleges that UC treated her differently to a similarly situated male student without a rational basis. (Doc. 2 at 11).

UC, on the other hand, urges the Court to disregard Ms. Roe's broad reading of *Miami University*. UC argues that:

> [*Miami University*'s] holding was limited to the context of an accused
> student who was so drunk he could not recall the encounter with the sober
> female victim. Where any student is sober, or says parts of the sex were
> consensual, and the other says he/she does not remember any of it, the
> incapacitation of the latter is manifest, and the school must at least question
> whether the incapacitated accused was taken advantage of.

(Doc. 19 at 22). A closer look at the facts before the Sixth Circuit in *Miami University*
makes clear that the circumstances there are noticeably different than the facts before the
Court in this case.

In *Miami University*, a male student was suspended from the university for
violating the school's sexual-assault policy by engaging in non-consensual sexual acts
with a female student. Before the encounter, both parties had consumed alcohol.
According to the female student, the two initially engaged in consensual sexual acts, but
later she stopped consenting and the male student continued to engage in non-consensual
sexual acts. After the incident, the male student told the female student and the
university that he was so intoxicated that he could not remember what occurred during
the night in question. *Miami Univ.*, 882 F.3d at 584.

The Sixth Circuit found the female student and male student to be similarly
situated for several reasons:

(1) The university received information that the male student had engaged
in non-consensual sexual acts (because the female student's friend
reported the incident) and that the female student had engaged in non-
consensual sexual acts (because the male student was so intoxicated he
could not provide consent and the female student had "kinda sobered
up").

(2) Both students engaged in sexual acts that were prohibited under the
school's policies if the acts were non-consensual.

> (3) Neither the female student nor the male student initiated a formal complaint regarding the other's conduct.

*See id.* at 596. Yet even though the male student and the female student were similarly situated, the school chose to pursue disciplinary action only against the male student. *Id.*

Here, Ms. Roe is <u>not</u> similarly situated to Mr. Doe as delineated by the Sixth Circuit in *Miami University*. First, while Ms. Roe now alleges that the school received notice that she was unable to consent to sexual activity with Mr. Doe because she had been drinking, she herself told the school that the sexual activity was consensual and told the school she was only tipsy. This is not analogous to *Miami University* where the accused male student was so intoxicated that he had no memory of the events in question, and so therefore could not have consented to the initial activity that the female student said was consensual. Here the distinctions between the two individuals are clear: Mr. Doe told UC that the sexual acts at issue were not consensual and Ms. Roe told UC that they were consensual. Moreover, unlike in *Miami University*, Mr. Doe did initiate a formal complaint and Ms. Roe did not initiate a formal complaint.

UC identifies several ways in which Ms. Roe and Mr. Doe are not similarly situated:

|  | **Jane Roe** | **John Doe** |
|---|---|---|
| Reported sexual misconduct to UC? | No | Yes |
| Claimed lack of consent? | No | Yes |
| Claimed inability to consent? | No | Yes |
| Claimed lack of memory? | No | Yes |
| Claimed would not have engaged in sexual activity if sober? | No | Yes |
| Self-described as? | "Tipsy, not too drunk." | Incapacitated and "had no direct memory of the events." |
| Testified that the sex was consensual? | Yes | No |

(Doc. 21 at 10).

The Court finds that UC was <u>not</u> operating under the same set of operative facts and had a rational basis to treat Ms. Roe and Mr. Doe differently under the circumstances presented in this case. UC was not obligated to investigate whether Mr. Doe had violated UC's Policy when Ms. Roe herself informed UC that the sexual activity was consensual, explained the reasons she believed the activity was consensual, and did not provide any information that would lead UC officials to believe she was incapacitated due to intoxication.

Accordingly, the Court finds that Ms. Roe has not met her burden to show that she and Mr. Doe were similarly situated, and, therefore, Ms. Roe cannot show that she is likely to succeed on her equal protection claim.

### a. Ms. Roe does <u>not</u> demonstrate that her treatment was based on gender discrimination

While Ms. Roe has failed to show she is likely to succeed on her equal protection

claim because she did not demonstrate that she and Mr. Doe were similarly situated, even if the Court assumes that Ms. Roe and Mr. Doe were similarly situated, Plaintiff also fails to prove by clear and convincing evidence that any unequal treatment was due to gender discrimination, *i.e.*, that she was investigated and disciplined because she is female, not male.

Ms. Roe's only argument on this element of her equal protection claim is that gender discrimination can be inferred because "UC is currently facing litigation from male students accusing the school of imposing discipline in a discriminatory manner." (Doc. 2 at 12).  Ms. Roe claims that this led the UC to "prosecute females accused of sexual assault."  (Doc. 17 at ¶ 86).

In *Miami University*, the Sixth Circuit found that the plaintiff, at the motion to dismiss stage, provided a "plausible inference of gender discrimination" with "statistical evidence that ostensibly shows a pattern of gender-based decision-making and the external pressure on Miami University supports . . . a reasonable inference of gender discrimination."  *Miami Univ.*, 882 F.3d at 593–94.  Here, Ms. Roe has not pointed to any statistical evidence demonstrating a pattern of gender-based decision-making at UC biased against female students.   Ms. Roe only points to alleged external pressure related to lawsuits from male students to support her claim that she was purposefully or intentionally discriminated against.  Courts have found that, while alleged external pressure may provide a plausible inference sufficient to survive a motion to dismiss, "a plausible inference is not sufficient to show likelihood of success on the merits as required for a preliminary injunction."  *Doe v. George Washington Univ.*, 305 F. Supp.

3d 126, 133–34 (D.D.C. 2018) (emphasis added). The Court finds that the alleged external pressure UC may face due to lawsuits from male students is insufficient to prove gender discrimination against Ms. Roe.

Accordingly, Ms. Roe has not satisfied either elements of her equal protection claim and has not shown she is likely to succeed on the merits for that claim.

### 2. Due Process Claim

Ms. Roe claims that UC violated her procedural due process rights by failing to permit her to effectively cross-examine her accuser and key witnesses. (Doc. 17 at ¶¶ 100–113; Doc. 18 at 6–14).

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). In order to show a likelihood of success on a procedural due process claim, a plaintiff must (1) "establish a constitutionally protected liberty or property interest" and (2) "show that such an interest was deprived without appropriate process." *Midkiff v. Adams Cty. Reg'l Water Dist.*, 409 F.3d 758, 762 (6th 2005).

### a. Ms. Roe has shown that her liberty and property interests are implicated

Ms. Roe claims that her suspension from UC damages her academic and professional reputation and has affected her ability to enroll in other institutions of higher education. (Doc. 2 at 13). Ms. Roe notes that these are constitutionally implicated property and liberty interests.

The Sixth Circuit has made clear that procedural due process is "implicated by higher education disciplinary decisions." *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005); *see also Cummins*, 662 Fed.Appx. at 445 (recognizing that due process "protections apply to higher education disciplinary decisions). Moreover, "[s]uspension 'clearly implicates' a protected property interest, and allegations of sexual assault may 'impugn' [a student's] reputation and integrity, thus implicating a protected liberty interest." *Doe. v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017) (citing *Cummins*, 662 Fed.Appx. at 445).

Therefore, Ms. Roe has identified property and liberty interests at stake. Accordingly, now the Court must determine if those interests were deprived without appropriate process.

### b. Ms. Roe has <u>not</u> shown that she was deprived of liberty and property interests without appropriate process.

In *Mathews*, the Supreme Court established a three-factor framework to evaluate the procedural protections due in a given situation: "(1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Miami Univ.*, 882 F.3d at 600 (citing *Mathews*, 424 U.S. at 335 (quotations omitted)).

When facing suspension, as is the situation here, a student is entitled to "the opportunity to be heard at a meaningful time and in a meaningful manner." *Cummins*, 662 Fed.Appx. at 446 (quoting *Mathews*, 424 U.S. at 333). At a minimum, a university must provide a notice of charges, an explanation of evidence against the student, and an opportunity for the student to present her side of the story before unbiased decisionmakers. *Id.* at 399–400. Importantly, "[r]eview under *Mathews* asks only whether [the accused] 'had an opportunity to respond, explain, and defend,' not whether a jury could constitutionally convict him using the same procedures." *Univ. of Cincinnati*, 872 F.3d at 400 (quoting *Cummins*, 662 Fed.Appx. at 446).

### i. Private interest at stake

As to the first *Mathews* factor, Ms. Roe contends, and UC does not dispute, that the private interest at stake – her educational and employment opportunities and reputation – is significant. The Sixth Circuit supports Ms. Roe's stance, having found that the private interest at stake in school disciplinary hearings is "substantial." *Univ. of Cincinnati*, 872 F.3d at 406. Accordingly, the first factor in the due process test weighs in Ms. Roe's favor.

### ii. Procedures used

As to the second *Mathews* factor, Ms. Roe contends that UC's cross-examination procedures did not adequately protect her private interests. Ms. Roe argues that by preventing cross-examination of Mr. Doe and CB related to the April 2017 Complaint, she was not allowed to reveal possible biases, prejudices, or ulterior motives that colored their hearing testimony. (Doc. 18 at 6).

18

UC argues that it met its obligation to allow Ms. Roe to cross-examine every witness via submission of written questions. (Doc. 21 at 16). Moreover, UC contends that it was within the discretion of the disciplinary hearing officers not to allow questions related to the April 2017 Complaint because they "were not relevant to whether Mr. Doe was capable of consenting to sexual activity in October of that year." (*Id.*).

While a "right to cross-examine witnesses generally has not been considered an essential requirement of due process in school disciplinary proceedings," *Univ. of Cincinnati*, 872 F.3d at 400 (quoting *Winnick v. Manning*, 460 F.2d 545 (2d Cir. 1972)), if a case presents an issue of witness credibility, cross-examination might "be essential to a fair hearing." *Id.* at 401 (quoting *Flaim*, 418 F.3d at 641). Cross-examination is important in situations where witness credibility is at issue because it "may expose forgetfulness, confusion, or evasion" or "may reveal possible biases, prejudices, or ulterior motives that color the witness's testimony." *Univ. of Cincinnati*, 872 F.3d at 402.

Here, there is no dispute that UC allowed Ms. Roe to submit questions for cross-examination of witnesses. Moreover, Ms. Roe herself testified that her cross-examination questions demonstrated that the "witnesses contradicted each other." (Doc. 16-3 at PAGEID # 560). Instead, Ms. Roe contends that her due process rights were violated because she was unable to have all of her questions to witnesses asked and therefore was unable to demonstrate witness bias. This argument is without merit.

As a threshold truth, witnesses did testify and submit statements regarding their past interactions with Ms. Roe, including the April 2017 incident, that could evince bias. (Doc. 16-3 at PAGEID # 547). One of Mr. Doe's roommates submitted a statement

19

recognizing that "during Spring Semester of 2017, [Ms. Roe] filed what he believed to be a false sexual assault charge against another ROTC student through Title IX. [Witness] stated that he was nervous that he was concerned about [Ms. Roe] being in the house because of the previous charge against [CB]." (Doc. 16-1 at PAGEID # 381). Another roommate "stated that he and his roommates do not like [Ms. Roe] . . . [the roommate] stated that [Ms. Roe] brought sexual harassment charges against a friend, [CB]. [The roommate] stated that he and his roommates had 'a bad taste in their mouths' because of the previous charges." (Doc. 16-1 at PAGEID # 392). Thus, the UC disciplinary board was well aware that witnesses might be biased against Ms. Roe.

Moreover, the record of the hearing demonstrates that witnesses were prevented from sharing information that may have been prejudicial to Ms. Roe, such as her sexual history, that was not directly relevant to the alleged sexual assault of Mr. Doe. (Doc. 16-3 at PAGEID # 548). The record indicates that the hearing was limited to "interactions between [Mr. Doe] and [Ms. Roe]." (*Id.*).

The evidence before the UC disciplinary board was not simply of the "he said/she said" nature that requires cross-examination, let alone unlimited cross-examination. *Univ. of Cincinnati*, 872 F.3d at 396. Unlike in *Doe v. Ohio State University*, cited by Ms. Roe, the decision of the UC disciplinary board did not come down to "who you believe: John Doe, or Jane Roe." *Doe v. Ohio State University*, 311 F.Supp.3d 881, 890 (S.D. Ohio 2018). Here, the UC disciplinary board was presented with evidence from Ms. Roe, including text messages she sent the night of the alleged sexual assault, that showed that she should have been aware that Mr. Doe was unable to provide consent.

20

(Doc. 16-1 at PAGEID # 411 ("I'm not leaving [Mr. Doe] till he's okay and he's really not.")).  <u>UC did not merely decide it believed Mr. Doe over Ms. Roe.</u>

The Court finds that UC did <u>not</u> provide inadequate due process to Ms. Roe by not asking every question that she wanted to be asked.  The Court is unaware of any precedent finding that a plaintiff in a school disciplinary hearing is entitled to unfettered cross-examination of witnesses.  UC's disciplinary board was aware of potential witness bias and focused its findings on whether Ms. Roe should have been aware that Mr. Doe was unable to provide consent to the sexual encounter at issue.

Accordingly, the second factor in the due process test weighs in UC's favor.

### iii.      Government interest

The Sixth Circuit has found that a university has a strong interest "in eliminating sexual assault on its campus and establishing a fair and constitutionally permissible disciplinary system." *Univ. of Cincinnati*, 872 F.3d at 404 (quoting *Doe v. Univ. of Kentucky*, 860 F.3d 365, 370 (6th Cir. 2017)).  As university administrators are in the field of education, not law, university disciplinary hearings need not follow the rules of evidence.  *Id.*  "To saddle [school administrators] with the burden of overseeing the process of cross-examination (and the innumerable objections that are raised to the form and content of cross-examination) is to require of them that which they are ill-equipped to perform."  *Newsome v. Batavia Local School Dist.*, 842 F.2d 920, 926 (6th Cir. 1988).  When cross-examination is required, the Sixth Circuit has found that school procedures comport with due process even when a disciplinary board "did not ask all of the questions [the accused students] submitted."  *Cummins*, 662 Fed.Appx. at 448.

Ms. Roe argues that "UC already allows accused students to pose questions to witnesses at certain disciplinary hearings.  Allowing questions about motive would not pose any additional administrative burden."  (Doc. 18 at 12).  However, the Court finds that UC did not in fact prohibit all questions related to witness credibility; instead, the disciplinary board prevented issues that it deemed prejudicial or irrelevant from being addressed in a hearing focused on Ms. Roe's alleged sexual assault of Mr. Doe.  What Ms. Roe essentially seeks is a requirement that UC ask witnesses all the questions submitted by an accused student during cross-examination, whether or not the questions are relevant to the disciplinary proceedings.  This would be considerably and unduly burdensome to UC.  UC has a strong interest in conducting hearings that exclude information that, within its discretion, it deems irrelevant.

Accordingly, the third factor in the due process test weighs in UC's favor.

Upon balancing the three factors, the Court finds that Ms. Roe has not proven a violation of her due process rights by clear and convincing evidence.

Thus, because Ms. Roe has not demonstrated a likelihood of success on either her equal protection claim or her due process claim, the first element of the injunction test weighs against granting a preliminary injunction.

### B.  Ms. Roe has shown irreparable harm

To demonstrate irreparable harm, Ms. Roe must show she "will suffer actual and imminent harm rather than harm that is speculative or unsubstantiated."  *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006).  Harm is irreparable if it cannot be fully compensated by monetary damages.  *Overstreet*, 305 F.3d at 578.

22

Ms. Roe notes that she is entitled to a presumption of irreparable harm <u>if</u> she demonstrates a likelihood of success on his constitutional claims.  *See Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (recognizing that the loss of First Amendment rights, for even a minimal period of time, constitutes irreparable harm). However, as discussed above, Ms. Roe has <u>not</u> demonstrated a likelihood of success on her constitutional claims, and thus no presumption of irreparable harm is warranted.

Nevertheless, Ms. Roe contends that, if a preliminary injunction is not granted, she will suffer irreparable harm because she will be denied the "benefits of education at her chosen school, would damage her academic and professional reputation, and may affect her ability to enroll at other institutions of higher education and to pursue a career." (Doc. 2 at 13).  Defendants do not contest Ms. Roe's irreparable harm, and the Sixth Circuit has found that a plaintiff's suspension constitutes an irreparable harm.  *Univ. of Cincinnati*, 872 F.3d at 407.  Therefore, Ms. Roe has demonstrated irreparable harm.

Accordingly, the second element of the injunction test weighs in favor of granting a preliminary injunction.

### C.  Harm to Others / Public Interest

The final factor in the injunctive relief analysis is whether granting the injunction would cause harm to others or would affect the public interest.  "The irreparable injury [the plaintiffs] will suffer if their motion for injunctive relief is denied must be balanced against any harm which will be suffered by [others] as a result of the granting of injunctive relief."  *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982).

Ms. Roe simply states that "an injunction will not cause any harm to third parties or UC." (Doc. 2 at 14). She additionally argues that an injunction is in the public interest because an "injunction to protect . . . constitutional and civil rights . . . is always in the public interest." *Dodds v. United States Dep't of Educ.*, 845 F.3d 217, 222 (6th Cir. 2016) (citing *G&V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)).

On the other hand, UC argues that issuing a preliminary injunction would harm third parties, specifically Mr. Doe and any other UC student "who braves to report sexual misconduct against another student and whose claim UC finds to have merit after an investigation and hearing." (Doc. 21 at 24). Additionally, UC contends that universities have a vested interest in enforcing disciplinary policies and maintaining a safe campus environment. (Doc. 21 at 24).

First, because the Ms. Roe has failed to show a likelihood of success on the merits, "[she] has not demonstrated that [she] suffered a violation of [her] constitutional rights and thus injunctive relief is not in the public interest." *Univ. of Cincinnati*, 2015 WL 5729328, at *3.

Second, this Court finds that granting an injunction preventing Ms. Roe's suspension "would likely disturb UC's ability to enforce its disciplinary procedures, which would not be in the public interest." *Id.*

Finally, this Court finds that issuing an injunction allowing Ms. Roe back on campus may place her in proximity to Mr. Doe, thus interfering with his rights. *Doe v. Univ. of Cincinnati*, 2015 WL 5729328, at *3 (S.D. Ohio Sept. 30, 2015); *see*

24

*also Marshall v. Ohio Univ.*, No. 2:15-cv-775, 2015 WL 1179955, at \*10 (S.D. Ohio Mar. 13, 2015) (finding "harm to others" prong weighed against issuance of temporary restraining order where reinstating plaintiff to honors program and placing plaintiff into close proximity with female student could interfere with her rights).

Accordingly, the final factor in the injunction test does not weigh in favor of granting a preliminary injunction.

Upon balancing the factors relating to the propriety of granting an injunction, and recognizing that it is well established that a finding that there is no likelihood of success on the merits of is usually fatal to a preliminary injunction, the Court finds that Ms. Roe is not entitled to a preliminary injunction.

## IV.   CONCLUSION

For these reasons, the Court finds that Plaintiff Jane Roe has not established by clear and convincing evidence her entitlement to the extraordinary remedy of a preliminary injunction.  Accordingly, Plaintiff's motion for a preliminary injunction (Doc. 2) is **DENIED**.

**IT IS SO ORDERED**.

Date:  _____8/21/18_____

Timothy S. Black
United States District Judge

25